******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ROBERT R.*
## (SC 20355)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of sexual assault in the first degree in connection with the sexual abuse of M, the stepsister of the defendant's girlfriend, S, the defendant appealed. At trial, M testified that the defendant had sexually assaulted her on four occasions, the first three of which occurred when M was a minor and the defendant was in his twenties. The fourth incident, which led to the defendant's conviction, occurred when M was eighteen years old. With respect to the latter incident, M testified that she was home alone when the defendant knocked on the door and that, after she asked him to leave, the defendant entered the home, grabbed her arm, pushed her toward the living room couch, and sexually assaulted her. M further testified that, after the defendant was startled by an outside noise, he went into the kitchen, where he ejaculated into a paper towel that he threw into a garbage can. At trial, the defendant denied that he ever sexually assaulted M, but he admitted to having consensual sex with her during that incident. He also denied that he ejaculated into a paper towel and threw it in the garbage. N, a forensic biologist, testified at trial regarding tests she conducted on the paper towel, which M had provided to the police shortly after the incident. N testified that those tests revealed the presence of semen but were negative for spermatozoa. P, a forensic science examiner, testified that tests she performed on the paper towel revealed the presence of the defendant's skin cells but were inconclusive as to whether his sperm cells were also present. Neither N nor P could indicate how the various substances came to be on the towel. During closing arguments, defense counsel focused on attacking M's credibility and exposing her motive to falsely accuse the defendant. Specifically, defense counsel attempted to present the defendant's theory of the case that M had planted evidence by wiping herself with the paper towel after engaging in a consensual sexual encounter with the defendant and then presenting that paper towel to the police. The trial court nevertheless sustained the prosecutor's objection and precluded defense counsel from making that argument, concluding that it was not supported by any evidence in the record. On appeal, the defendant contended, inter alia, that the trial court had violated his constitutional right to the assistance of counsel by precluding defense counsel from arguing to the jury that M had planted physical evidence on the paper towel in an effort to falsely accuse the defendant. *Held*:

1. The trial court improperly precluded defense counsel from arguing to the jury during closing argument that M had planted physical evidence on the paper towel in an effort to substantiate her false allegations against the defendant, in violation of the defendant's constitutional right to the assistance of counsel, and, accordingly, this court reversed the judgment of conviction and remanded the case for a new trial:

   a. The trial court improperly restricted the scope of defense counsel's closing argument by barring him from presenting the defendant's theory of the case, as there was sufficient evidence in the record from which the jury reasonably could have inferred that M planted the evidence on the paper towel to substantiate her false allegations against the defendant: defense counsel relied on reasonable inferences from the facts in evidence, including the conflicting testimony of M and the defendant regarding the incident and whether the defendant ejaculated into the paper towel, testimony that it was M who provided the paper towel to the police, the testimony of N and P regarding their findings, and the testimony of one of M's stepsisters that M had a history of making false claims; moreover, the evidence presented at trial, namely, that M had a tumultuous relationship with her family, that she had a history of making false claims, and that she had been engaged in a consensual romantic relationship with the defendant, who married S only months after the incident in question, provided a basis for the jury to reasonably infer that M had

a motive for planting evidence of the defendant's DNA on the paper towel.
b. The trial court's improper limitation on the scope of defense counsel's closing argument deprived the defendant of his constitutional right to the assistance of counsel, and, accordingly, the defendant was entitled to a new trial; M's testimony was the only source of evidence from which the jury reasonably could have concluded that the sexual encounter with the defendant was not consensual, the only argument presented by defense counsel to establish reasonable doubt as to the defendant's guilt concerned M's credibility, and, because the evidence regarding the paper towel provided the strongest evidence, from the defendant's perspective, that M lied about the incident, depriving defense counsel of the opportunity to make that argument was to deprive the defendant of the full and fair participation of his counsel in the adversary process.

2. The defendant could not prevail on his claim that the evidence was insufficient to support his conviction of sexual assault in the first degree on the ground that the state failed to prove that he used force or the threat of force; M's testimony with respect to the alleged sexual assault, including that the defendant grabbed her arm, pushed her toward the couch, removed her underwear, and inserted his penis inside of her as she tried to push him off and protested, was sufficient to establish the force element required for a conviction of first degree sexual assault.

3. This court declined to address the defendant's claim that the trial court had abused its discretion in admitting the testimony of an expert in the field of child and adolescent sexual abuse, insofar as the expert's expertise was in child sexual abuse and M was eighteen years old when the incident at issue occurred; although it was possible that the defendant's claim would arise during the defendant's new trial if the prosecutor elected to call the same expert, the trial court may further evaluate the issue on remand, as the prosecutor may call that expert and probe her experience in working with eighteen year olds or may call a different expert, in which case the record would look different from the one presently before this court.

Argued May 6—officially released August 6, 2021**

*Procedural History*

Substitute information charging the defendant with three counts of the crime of risk of injury to a child, and with one count each of the crimes of sexual assault in the first degree and sexual assault in the second degree, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Russo, J.*; verdict and judgment of guilty of sexual assault in the first degree, from which the defendant appealed. *Reversed*; *new trial*.

*Cameron L. Atkinson*, with whom, on the brief, were *Norman A. Pattis*, *Kevin Smith* and *Zachary Reiland*, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Ann F. Lawlor*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Robert R., appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the first degree. On appeal, the defendant claims that (1) the trial court violated his sixth amendment right to the assistance of counsel by precluding defense counsel during closing argument from arguing to the jury that the complainant, M, had planted physical evidence on a paper towel in an effort to substantiate her false allegations against the defendant, (2) there was insufficient evidence to prove that the defendant used force or the threat of force, as required to sustain his conviction of sexual assault in the first degree, and (3) the trial court improperly admitted expert testimony from a witness who specializes in child and adolescent sexual abuse. We agree with the defendant with respect to his first claim and, accordingly, reverse the judgment of conviction.

The jury reasonably could have found the following relevant facts. When M was twelve years old, she moved to Bridgeport to live with her father, Louis, stepmother, Dora, and stepsister, Isabelle. Another of M's stepsisters, Stephanie, was dating the defendant. Stephanie and the defendant lived together down the street from Louis and Dora. At the time M moved to Bridgeport, the defendant was in his mid-twenties. M testified that the defendant sexually assaulted her on multiple occasions and exposed her to sexually inappropriate situations when she was between the ages of thirteen and eighteen years old. Specifically, M testified to four incidents.

The first incident described by M occurred when she was thirteen years old. One evening, the defendant came to M's house because he had an argument with Stephanie. Louis told the defendant that he could "stay on the couch." M testified that, when she brought the defendant a blanket, he "touch[ed] [her] butt," followed her to her bedroom, and sexually assaulted her. M testified that, the next morning, the defendant sexually assaulted her a second time in her bedroom. M told Louis about the sexual assaults, and Louis and Dora then took her to Bridgeport Hospital. M ultimately left the hospital before being examined by a physician. Louis' testimony regarding this incident, however, varied from M's. He testified that, on the evening in question, he and the defendant were watching wrestling and drinking beer in the living room. The defendant went upstairs to use the bathroom. Louis recalled that he went upstairs and found the defendant, fully clothed, looking in on M while she slept. He then told the defendant to "get the hell out," and the defendant left the house. Louis also testified that he found the defendant hiding in the closet in M's bedroom one morning but could not recall if it was the morning after he first found the defendant looking in on M.

M also recounted a second incident. She testified that, when she was thirteen years old, the defendant asked her to send him nude pictures of herself. M testified that she complied and that the defendant then sent her a nude picture of himself. Isabelle, however, testified that she was present when the defendant and Stephanie informed Louis that M had been sending the defendant nude pictures of herself. Isabelle also testified that she did not know anything about the defendant sending pictures to M. Finally, Isabelle recalled that M had a history of "making false claims."

M described a third incident that occurred when she was fourteen or fifteen years old. M testified that, one night, when her friend, V, slept over at her house, the defendant came into M's bedroom, removed her clothes, and sexually assaulted her. V confirmed that she regularly slept over at M's house. She stated that, during the sleepovers, she would sleep in M's twin bed with M. V testified, however, that she did not recall the defendant ever entering M's bedroom while she slept over.

Finally, M testified that a fourth incident occurred on July 28, 2016, when M was eighteen years old. Specifically, M recounted that, after returning home from a summer program at a nearby university, she let her dog out into her fenced in backyard. Shortly thereafter, the defendant knocked on the front door. When M opened the door, she saw the defendant holding her dog, and he explained that he found the dog down the street from M's house. M took the dog from the defendant, and the defendant asked M where Louis was. M responded that he had not arrived home from work. M then asked the defendant to leave because Louis did not want him there when M was home alone. M testified that the defendant, instead of leaving, kept inching into the home, until he grabbed M's arm, pushed her toward the living room couch, and sexually assaulted her. M testified that, during the assault, "I was trying to push him off me with my arms, but he kept holding [them] down, so I kept turning my body like this, with my knees, trying to push him off me, and he didn't want to get off. And I was yelling, help, can you stop, can you get off me, and then he didn't want to get off me." M testified that the defendant ended the assaultive sexual intercourse with her suddenly when he was startled by a car pulling out of a neighbor's driveway. According to M, the defendant got off of her, went into the kitchen, began to masturbate, ejaculated into a paper towel, threw the paper towel into a garbage can, and left.

Following the assault, M called Louis and told him what had just transpired. She also texted Isabelle that the defendant had "touched" her and that she "fe[lt] disgusted." The police were subsequently called, and M reported the incident to officers on the scene and provided them with the paper towel into which she claimed the defendant had ejaculated. M was then taken

by ambulance to the hospital, where medical personnel performed a physical examination and administered a sexual assault evidence collection kit. The defendant was interviewed by the police and denied having any sexual contact with M.

In connection with the allegations made by M, the state charged the defendant with one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and two counts of risk of injury to a child in violation of § 53-21 (a) (1).

At trial, the defendant testified in his own defense. He denied each allegation, stating that he never sexually assaulted M. The defendant, however, did admit to having consensual sex with M on July 28, 2016, when she was eighteen years old, a claim that he denied when he was initially questioned by the police. He explained to the jury that he lied to the police initially because he was being interviewed within earshot of Stephanie, and she did not know at that point that he had "cheat[ed] on" her with M. The defendant testified that he began having consensual, physical encounters with M in March, 2016. He stated that the encounters began with "romantic conversations" in the car, then progressed to making out, and eventually led to the two having consensual sex. The defendant testified that they had consensual sex on two occasions: first, approximately one week prior to the July, 2016 incident in M's home, and, the second time, on July 28, 2016.

With respect to the July 28, 2016 incident, the defendant testified that he had found M's dog on the street and took it back to her house. When M opened the door, she hugged him, and they began to kiss. According to the defendant, things quickly progressed, and the two began having sex against the doorway. The defendant testified that, shortly after moving to the couch, he became self-conscious, realizing that this was the time that Louis typically arrived home from work, and he was worried that Louis would walk in on them. The defendant further testified that, as a result, he ended the encounter, left the house, and went home. The defendant specifically denied M's claim that he ejaculated into a paper towel and threw it in the garbage can, explaining that, after he stopped having sexual intercourse, he just pulled up his pants and left. He also testified that M did not seem upset when he left the house.

Jennifer Nelson, a forensic biologist, also testified at trial. Nelson testified that she analyzed the bodily fluids found on the paper towel at the state forensic laboratory. Specifically, she conducted tests on the paper towel, looking for the presence of semen and spermatozoa.[1] These tests revealed the presence of semen on

the paper towel but were negative for spermatozoa. Nelson testified that she did not know how the substances came to be on the paper towel. Angela Przech, who works as a forensic science examiner at the state forensic laboratory, testified that she performed DNA testing on a stain found on the paper towel. Przech's testing revealed that the defendant's DNA profile was included in a DNA mixture found in an epithelial fraction sample of the stain.[2] Przech testified that she assumed that M was the other DNA contributor. Regarding the DNA profile found in the sperm-rich fraction sample, M was eliminated as a source, and the defendant's "profile was inconclusive when compared to the evidentiary sample." In short, Przech's testing revealed that the defendant's skin cells were on the paper towel, but her testing was inconclusive as to whether his sperm cells were also present. Przech also testified that she did not know how the substances came to be on the paper towel.

The jury ultimately found the defendant guilty of sexual assault in the first degree in connection with the events of July 28, 2016, and not guilty of the remaining charges. The court sentenced the defendant to a total effective sentence of twenty years' incarceration, two of which are the mandatory minimum, suspended after eight years, and ten years of supervised probation. This appeal followed. Additional facts will be set forth as necessary.

I

We first consider the defendant's claim that the trial court improperly precluded defense counsel during closing argument from arguing to the jury that M had planted physical evidence on the paper towel in an effort to substantiate her false allegations against the defendant, thereby violating the defendant's right to the assistance of counsel under the sixth amendment to the United States constitution.

During closing argument, defense counsel focused on attacking M's credibility and exposing her motive to falsely accuse the defendant. Specifically, with respect to the events of July 28, 2016, defense counsel "attempted to present [his] theory that [M] wiped her genitals with the paper towel after the defendant left . . . following their consensual, sexual encounter, and then presented that paper towel to the police in an effort to manufacture evidence to support her false claim that the intercourse was not consensual, but sexual assault." Specifically, the following exchange transpired:

"[Defense Counsel]: So, when you look at that event, you know, July 28, 2016, [M's] version is—is not—is not credible. And I should say it isn't a competition between which version you find more credible. It is whether . . . the evidence that's presented here con-

vinces you beyond a reasonable doubt. And, again, the judge will instruct you as to what that means, but it means more than possibly or probably.

"And with respect to the evidence with the paper towel, you heard . . . Nelson testify that they did not find sperm on that towel, they found components of semen. And I did ask her, wouldn't you expect to find sperm on there if there was ejaculate on there? She said, well, not necessarily, or something along those lines. *But—and you heard* [*the defendant*] *testify, I never touched a paper towel, he doesn't know what they're talking about. Well, then, how does* [*his*] *DNA get on the paper towel? And the answer is it comes from* [*M*]. *That's her house, her kitchen.* And—

"[The Prosecutor]: I'm going to object, Your Honor; there was no evidence to that.

"The Court: [Defense counsel]?

"[Defense Counsel]: It's argument, Your Honor.

"The Court: I don't think there was any evidence in the record of what you are explaining to the jury now. I'm going to sustain the state's objection.

"[Defense Counsel]: Very good, Your Honor. So, again, the case comes down to credibility, and the center of the state's case is the complaining witness, [M], and her testimony is not credible, certainly not credible enough to remove the state's burden of [proof] beyond a reasonable doubt." (Emphasis added.)

During the state's rebuttal closing argument, the prosecutor focused on bolstering M's credibility and attacking the defendant's credibility. The prosecutor also highlighted M's testimony regarding the paper towel. Specifically, the prosecutor stated: "[M] told us how a neighbor was pulling out of the driveway, [she and the defendant] could hear the neighbor pulling out of the driveway. The driveway, according to [M], was right next to the—or abutted the living room in the home. And the defendant heard that, jumped up, ejaculated into a paper towel in the kitchen, which is a big, open room, and left."

The defendant contends that defense counsel's argument, that M planted the defendant's DNA on the paper towel, was consistent with the physical evidence collected from the paper towel and the defendant's testimony. Had defense counsel been allowed to argue that M planted the evidence on the paper towel, the defendant claims, M's "credibility would have been further challenged." In short, the defendant contends that the state had the opportunity to fully present its theory of the case to the jury but that he was not afforded the same opportunity.

The state disagrees and contends that the defendant's claim on appeal "is meritless because there was no evidence before the jury from which it reasonably could

have concluded that the semen stains found on the paper towel were put there by M." Therefore, the state argues, "the trial court properly precluded [defense counsel] from urging the jury to reach a conclusion based solely on speculation." Alternatively, the state contends that, even if the trial court's ruling was improper, it did not deprive the defendant of his sixth amendment right to the assistance of counsel.

We begin with the standard of review and relevant legal principles. "The sixth amendment guarantee in the federal constitution of the right to assistance of counsel has been held to include the right to present closing arguments."[3] (Internal quotation marks omitted.) *State* v. *Ames*, 171 Conn. App. 486, 516, 157 A.3d 660, cert. denied, 327 Conn. 908, 170 A.3d 679 (2017). As the United States Supreme Court has explained, "[t]here can be no doubt that closing argument for the defense is a basic element of the adversary [fact-finding] process in a criminal trial. Accordingly, it has universally been held that [defense counsel] has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." *Herring* v. *New York*, 422 U.S. 853, 858, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975).

"In general, the scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations. . . . [Although] we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 59–60, 612 A.2d 755 (1992). Although defense counsel may not make speculative arguments to the jury, we have explained that "counsel may comment [on] facts properly in evidence and [on] *reasonable inferences* drawn therefrom." (Emphasis added.) *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977).

It is beyond dispute that, "[i]f the trial court denies the defendant an opportunity to give closing arguments, the reviewing court should grant a new trial." *State* v. *Plaskonka*, 22 Conn. App. 207, 211, 577 A.2d 729, cert. denied, 216 Conn. 812, 580 A.2d 65 (1990). We have gone further and held that "[t]he right to present a closing argument is abridged not only when a defendant is completely denied an opportunity to argue before the court or the jury after all the evidence has been admitted, but also when a defendant is deprived of the

opportunity to raise a significant issue that is reasonably inferable from the facts in evidence. This is particularly so when . . . the prohibited argument bears directly on the defendant's theory of the defense." *State* v. *Arline*, supra, 223 Conn. 64.

Here, defense counsel's closing argument focused on attacking M's credibility and exposing her motive to falsely accuse the defendant of sexual assault. Defense counsel sought to present his theory of the case to the jury—that M had planted the evidence on the paper towel by wiping herself following a consensual, sexual encounter with the defendant. It is clear to us that this argument was proper because it is based on reasonable inferences from facts in evidence. Contrary to the trial court's conclusion that there was no evidence in the record to support the argument, we conclude that defense counsel's argument relied on reasonable inferences from the following evidence: (1) M's testimony that the defendant ejaculated into the paper towel following the alleged sexual assault; (2) testimony from both M and an officer who responded to the scene that M provided the paper towel to the police; (3) Nelson's testimony that no spermatozoa were present on the paper towel; (4) Przech's testimony that she assumed that the DNA found on the paper towel matched M's; (5) the defendant's testimony denying M's claim that he ejaculated into a paper towel and his version of events that, after he stopped having sex, he just pulled up his pants and left; (6) the fact that only M and the defendant were home at the time of the incident; and (7) according to at least one witness, M had a history of "making false claims."

Moreover, the jury reasonably could have concluded, on the basis of various testimony throughout trial, that M's relationship with her family was strained and that M and the defendant were engaged in a romantic, consensual relationship. For example, M testified that she was worried that Louis would not believe her about the July 28, 2016 assault because she and Dora did not have a good relationship. The nature of M and Dora's relationship was confirmed by Dora, who testified that she "tried to have a relationship with [M], but she never let me in," and that M told her many times, "you're not my mother." Dora also told the police that M was ruining her relationship with Louis. Additionally, Isabelle testified that she was aware of "a history of [M] making false claims." For her part, Stephanie testified that she does not speak to Louis and they are not on good terms as a result of the July 28, 2016 incident. These facts provided a basis for the jury to reasonably infer that M had a motive for planting the defendant's DNA on the paper towel.

As to the nature of the relationship between M and the defendant, the defendant testified that, in March, 2016, he and M began "having romantic conversations,"

they began "getting intimate," and were in a "romantic relationship . . . ." The defendant also testified that, by July, 2016, he and M "were already in a relationship, and not a relationship as boyfriend and girlfriend, more as we were making out type stuff." Indeed, during her rebuttal closing argument, the prosecutor emphasized the defendant's characterization of the nature of his relationship with M as a "love affair . . . ." Finally, the defendant testified that he was engaged to Stephanie and ultimately married her just three months after M alleged that he had sexually assaulted her. Again, these facts tended to make reasonable the defendant's theory regarding the paper towel.

It would not have been an unreasonable inference for the jury to conclude that M had planted the evidence on the paper towel after the sexual encounter with the defendant ceased, either because of her tumultuous relationship with her family or because she was romantically interested in the defendant and was not happy that he was engaged to Stephanie. Moreover, regardless of her motive for allegedly planting the evidence, the jury was presented with two versions of events based solely on the testimony of M and the defendant. M testified that the defendant ejaculated into a paper towel. The defendant testified that he did not. Given that it is undisputed that the only two people in the home at the time of the alleged sexual assault were M and the defendant, if the jury accepted the defendant's testimony that he did not ejaculate into a paper towel, it would not have been an unreasonable inference to conclude that the only other way the defendant's DNA could have gotten on the paper towel was by M's act of placing it there. To be sure, it is no less reasonable than an inference that the defendant ejaculated into the paper towel. As the prosecutor conceded at oral argument, Nelson and Przech did not testify that it was more likely than not that the defendant's DNA ended up on the paper towel as a result of the defendant's ejaculating into it. They both testified that they did not know how the defendant's DNA came to be on the paper towel. Thus, the jury's determination as to how the defendant's DNA came to be on the paper towel was based solely on the testimony of M and the defendant. Defense counsel's argument was not "sheer speculation" or "rhetorical advocacy"; (internal quotation marks omitted) *State* v. *Manley*, 195 Conn. 567, 580, 489 A.2d 1024 (1985); rather, it was based on logical inferences from the facts as presented to the jury if it credited the defendant's testimony.

In *Arline*, we "agree[d] with the reasoning of the Maine Supreme [Judicial] Court in *State* v. *Liberty*, 498 A.2d 257 (Me. 1985)." *State* v. *Arline*, supra, 223 Conn. 65 n.11. In *Liberty*, the Maine high court concluded that the trial court erred in restricting defense counsel from arguing in summation certain evidence that had been admitted without objection. *State* v. *Liberty*, supra, 258.

The court explained: "In a closing argument each party should be permitted to summarize the case from the perspective of that party's interpretation of all the evidence in the case and the inferences to be drawn therefrom. It is not for the presiding [judge] to proscribe argument as to a portion of the evidence which the jury has heard." Id., 259. Likewise, in the present case, defense counsel should have been permitted to present the defendant's theory of the case to the jury, just as the state did, given that there was sufficient evidence in the record from which the jury reasonably could have inferred that M planted the evidence on the paper towel to substantiate her false allegations against the defendant.

The state nevertheless contends that the defendant's argument relies on "the assumption that, if the jury credited the defendant's testimony, the only way it could have reconciled that testimony with the lab results was by concluding that M had wiped her genitals after a consensual encounter" with the defendant. The state purports to negate that assumption by speculating about other possible conclusions the jury could have reached on the basis of the defendant's testimony and the other evidence in the record. We are not persuaded. The defendant is not required to prove that *the only way* the jury could have reconciled the testimony and other evidence was by concluding that M wiped herself with the paper towel. The defendant need only establish that *one way* the jury could have reconciled all the testimony and other evidence was by concluding that M wiped herself. In other words, the defendant does not have to conclusively establish that the jury would have accepted his argument; he need only establish that it was a reasonable inference for the jury to make on the basis of the evidence. See, e.g., *State* v. *Kinsey*, supra, 173 Conn. 348 ("counsel may comment [on] facts properly in evidence and [on] reasonable inferences drawn therefrom").

Accordingly, we conclude that the trial court improperly restricted the scope of defense counsel's closing argument when it barred counsel from arguing to the jury that M had planted physical evidence in an effort to substantiate her false allegations against the defendant. We next consider whether the trial court's action in denying the defendant the opportunity to present his theory of the case to the jury denied him the right to the assistance of counsel.

The right to the assistance of counsel ensures an "opportunity to participate fully and fairly in the adversary [fact-finding] process." *Herring* v. *New York*, supra, 422 U.S. 858. "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their

respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." Id., 862. "In a criminal trial, which is in the end basically a [fact-finding] process, no aspect of [partisan] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." Id.

Our appellate courts have previously found reversible error when the trial court precluded defense counsel from discussing certain issues during closing argument, particularly when an issue was significant and "[bore] directly on the defendant's theory of the defense." *State* v. *Arline*, supra, 223 Conn. 64. For example, in *Arline*, this court reversed the judgment of the Appellate Court and remanded the case for a new trial when the trial court improperly precluded defense counsel from questioning the credibility of the complainant during closing argument. Id., 64–65. Specifically, we concluded that the trial court improperly precluded defense counsel during closing argument from commenting on certain facts that had been elicited from the complainant on cross-examination that tended to establish her motive or bias. Id., 55–56, 62–63. We explained that the defendant's theory of defense was centered on attacking the complainant's credibility, and, although there were other pieces of evidence that called the complainant's credibility into question, the testimony elicited on cross-examination provided the only evidence of motive or bias. Id., 64. Given the centrality of the issue to the case, we concluded that preventing defense counsel from arguing motive or bias of the state's chief witness deprived the defendant of his sixth amendment right to the assistance of counsel. Id., 64–65; see, e.g., *State* v. *Ross*, 18 Conn. App. 423, 433–34, 558 A.2d 1015 (1989) (defendant was entitled to new trial when trial court prohibited defense counsel from commenting on fact that sole eyewitness to shooting, under state's theory of case, did not testify at trial).

Here, M's testimony was the only source of evidence from which the jury reasonably could have concluded that the defendant sexually assaulted her.[4] The results of the forensic testing and the sexual assault evidence collection kit did not establish that the July 28, 2016 sexual encounter, which the defendant admitted occurred, was nonconsensual.[5] The only argument presented by defense counsel to establish reasonable doubt of the defendant's guilt was directed at M's credibility. Although there were numerous evidentiary bases from which M's credibility could be challenged,[6] the testimony and other record evidence regarding the paper towel provided the strongest evidence, from the defendant's perspective, that M lied about the July 28, 2016

encounter. To deprive defense counsel of the opportunity to argue that the state's chief witness lied, when the linchpin of the defense was attacking the credibility of that witness, is to deprive the defendant of the full and fair participation of his counsel in the adversary process. See, e.g., *State* v. *Arline*, supra, 223 Conn. 64 ("The right to present a closing argument is abridged . . . when a defendant is deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence. This is particularly so when . . . the prohibited argument bears directly on the defendant's theory of the defense.").

The trial court's restriction on defense counsel's closing argument was particularly significant in this case because the state argued that M's testimony was credible because she had no motive to fabricate her testimony. During the state's rebuttal closing argument, the prosecutor argued: "Why on earth, if [M and the defendant] are in a sexual relationship, would [M] call [Louis] and call and text Isabelle about the defendant sexually assaulting her, and then [talk] to the police about it, [talk] to the people at the hospital about it? Why would she do that? How does [M's] life get any better by making this up? Ask yourselves that." What's more, the prosecutor emphasized to the jury that the defendant had lied to the police when he was initially questioned. Specifically, the prosecutor stated: "In assessing the defendant's credibility, I would ask—I would urge you to consider the lies that the defendant told, that he admitted he told while he was—when he was testifying here. We know that he lied to the police about being in the house on July 28, 2016. He lied. He was in the house. . . . We know that he lied to the police about not having sexual contact with [M] on that date. . . . He lied to [Stephanie]. He admitted to lying about that."

This case turns on questions of credibility, and we find it disconcerting that the defendant was not afforded an equal opportunity to emphasize his theory that M also lied about the July 28, 2016 incident. The entire case with respect to the July 28, 2016 incident centered on the credibility of the only two eyewitnesses to that incident. The effectiveness of the defendant's arguments regarding M's credibility was critical to the outcome, particularly when there was other testimony from M's stepsister, Isabelle, that M had a history of "making false claims." Indeed, this is particularly noteworthy because the jury did not credit M's version of events with respect to the other instances of alleged misconduct given that it found the defendant not guilty of the remaining charges. Accordingly, we conclude that the trial court's limitation of the scope of defense counsel's closing argument was improper and deprived the defendant of his constitutional right to the assistance of counsel.

Once a violation of the sixth amendment right to the

assistance of counsel has been established, we need not inquire as to whether the error resulted in prejudice to the defendant. "[A] per se rule of automatic reversal more properly vindicates the denial of the defendant's fundamental constitutional right to assistance of counsel guaranteed by the sixth amendment." *State* v. *Mebane*, 204 Conn. 585, 595, 529 A.2d 680 (1987), cert. denied, 484 U.S. 1046, 108 S. Ct. 784, 98 L. Ed. 2d 870 (1988); see, e.g., *State* v. *Arline*, supra, 223 Conn. 65. We, therefore, reverse the judgment of the trial court and remand the case for a new trial.

## II

We next turn to the defendant's contention that the evidence presented at trial was insufficient to prove that he used force or the threat of force, as required to sustain his conviction of sexual assault in the first degree. Although we have determined that the defendant is entitled to a new trial, we address this claim because, if it is meritorious, a retrial would be barred by principles of double jeopardy. See, e.g., *State* v. *Hedge*, 297 Conn. 621, 655, 1 A.3d 1051 (2010).

The defendant concedes that this claim was not properly preserved at trial. It is well established, however, that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)]. . . . Accordingly, because there is no practical significance . . . for engaging in a *Golding* analysis, we review an unpreserved sufficiency of the evidence claim as though it had been preserved." (Citation omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

To establish that the defendant violated § 53a-70 (a) (1), the state was required to prove that the defendant "compel[led] another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . ." The defendant contends that the state's evidence of force or threat of force was improbable and unconvincing, and that the state presented no physical evidence to support M's allegation of sexual assault by force.

"The standard of review [that] we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably

could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Importantly, we have previously held that "a single witness is sufficient to support a finding of guilt beyond a reasonable doubt." *State* v. *Whitaker*, 215 Conn. 739, 757 n.18, 578 A.2d 1031 (1990).

Here, with respect to the July 28, 2016 incident, M testified: "[The defendant] grabbed my arm, and I told him to let me go, and he did not want to release me. And then I ended up tripping toward the couch, where he pushed me toward . . . . I was wearing a dress, and I had shorts underneath, and he ended up pulling down my pants and my underwear and inserting his penis inside me. . . . I was pushing him off, yelling, telling him to stop and get off me. . . . He kept forcing himself on me." She also testified that, during the assault, "I was trying to push him off me with my arms, but he kept holding [them] down, so I kept turning my body like this, with my knees, trying to push him off me, and he didn't want to get off. And I was yelling, help, can you stop, can you get off me, and then he didn't want to get off me." This testimony alone is sufficient to establish the force element required for a conviction of sexual assault in the first degree in violation of § 53a-70 (a) (1).[7] See, e.g., *State* v. *White*, 139 Conn. App. 430, 436–37, 55 A.3d 818 (2012) (rejecting sufficiency challenge to first degree sexual assault conviction when complainant's testimony, if credited, satisfied all elements of § 53a-70 (a) (1)), cert. denied, 307 Conn. 953, 58 A.3d 975 (2013); see also, e.g., *State* v. *Antonio W.*, 109 Conn. App. 43, 52–53, 950 A.2d 580, cert. denied, 289 Conn. 923, 958 A.2d 153 (2008).

This evidence, viewed in the light most favorable to sustaining the guilty verdict, is sufficient to support the defendant's conviction of sexual assault in the first degree.

### III

The defendant's final claim is that the trial court abused its discretion by admitting the testimony of Janet Murphy, an expert in the field of child and adolescent sexual abuse. Specifically, the defendant contends that the trial court improperly admitted Murphy's testimony given that her expertise was in child sexual abuse and that M was an adult when the July 28, 2016 incident occurred. The defendant further contends that "[t]he state failed to show that Murphy had sufficient knowledge from her experience, training, or education to testify as an expert in the field of adult sexual abuse . . . ." (Emphasis omitted.) As such, the defendant claims that Murphy's expertise was inapplicable to the present case. The state contends that this argument is unpreserved. Alternatively, the state contends that the

claim is substantively meritless because M was eighteen at the time of the July 28, 2016 incident and Murphy testified that she "see[s] kids really up into the early twenties, more up to eighteen, but some delayed adults we'll see into the early twenties . . . ."

As a general matter, when our appellate courts reverse a judgment and remand the case for a new trial, only claims likely to arise on retrial are addressed by the reviewing court. See, e.g., *State* v. *T.R.D.*, 286 Conn. 191, 195, 942 A.2d 1000 (2008). In this case, we are remanding the case for a new trial with respect to the charge of sexual assault in the first degree in connection with the July 28, 2016 incident. It is undisputed that, at the time of this incident, M was eighteen years old. Although we cannot say that the claim relating to Murphy's expert testimony is unlikely to arise on remand, because the state may elect to call Murphy and further probe her experience working with eighteen year olds, or it may call another expert, that evidentiary presentation would involve a record different from the one presently before us, and, accordingly, we decline to address this claim at this time. See, e.g., *State* v. *Jackson*, 334 Conn. 793, 822, 224 A.3d 886 (2020); *State* v. *Rizzo*, 266 Conn. 171, 250–51 n.44, 833 A.2d 363 (2003). We leave it to the trial court to further evaluate the issue if Murphy is called to testify at the defendant's new trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** August 6, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Nelson testified that spermatozoa are "sex cell[s] that [are] deposited in semen when ejaculated from a male."

[2] Przech explained that sperm cells and epithelial cells are different: "[E]pithelial cells are like your skin cells, and the sperm cells are from sperm."

[3] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

The sixth amendment right to the assistance of counsel applies to state criminal proceedings by incorporation through the due process clause of the fourteenth amendment. See, e.g., *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

[4] As defense counsel emphasized during closing argument, "[t]his case essentially comes down to one witness. All of these accusations stem from one individual, the complaining witness, [M]. There are medical reports and—and other reports that are there, but she is the source of that information. There isn't any independent information in those reports. So, we should look at her testimony and her credibility and assess [that evidence] to see if it supports a finding of [guilt] beyond a reasonable doubt . . . ."

[5] Although the results of the sexual assault evidence collection kit established that the defendant's DNA was included in the sperm-rich fraction sample of the vaginal swab, they contained no evidence that the July 28, 2016 incident was nonconsensual. Indeed, the nurse who administered the sexual assault evidence collection kit testified that there was no evidence of trauma, scratches, or bruises, and no physical injuries were noted in the report.

[6] For example, although M testified that she was violently sexually assaulted, her text to Isabelle indicated that the defendant had "touched"

her. Additionally, the state did not introduce any evidence of physical injuries or ripped clothing.

[7] In addition to M's testimony, the emergency medical technician (EMT) who responded to M's house on July 28, 2016, testified that M was "visibly, tearfully upset" and was "very . . . uncomfortable . . . ."

--------------------------------------------