# STATE OF CONNECTICUT *v.* SIRUS DIXON
## (SC 20784)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of manslaughter in the first degree with a firearm, the defendant appealed to this court. The defendant's conviction stemmed from an incident in which he and two friends encountered the victim and his friend, G, whom the defendant had previously assaulted. G witnessed the defendant pull a gun from his waistband, and, as G and the victim fled, a shot was fired, which ultimately struck and killed the victim. On appeal, the defendant claimed, inter alia, that the trial court improperly allowed C, one of the state's witnesses, to testify as an expert about neighborhoods, neighborhood

State *v.* Dixon

divisions, and the dynamics between neighborhoods in Stamford, the city in which the victim's killing occurred. *Held*:

The defendant could not prevail on his claim that his right to due process was violated insofar as C implicitly invoked racial stereotypes when he characterized the Black residents in certain Stamford neighborhoods as being engaged in firearms and drug trafficking, and in violent criminal activity, as C never testified before the jury regarding the demographics of the various Stamford neighborhoods, or regarding race in general, and, even though C did testify about firearms and drug trafficking in Stamford, he did not connect those activities to specific neighborhoods or the Black residents in those neighborhoods.

The trial court abused its discretion when it permitted C to offer expert testimony about various Stamford neighborhoods, neighborhood divisions, and the dynamics between them.

C's "neighborhood" testimony amounted to testimony about gang activity in various Stamford neighborhoods, and, because the state conceded that there was no evidence that the defendant was a member of a gang, such testimony had limited probative value, and any probative value was outweighed by the danger of unfair prejudice.

Moreover, C's testimony was not the proper subject of expert testimony simply because it may have been related to the defendant's motive, as the state was able to present evidence through fact witnesses to establish a possible motive for the shooting, and there was no indication that C had any peculiar knowledge or experience that would have aided the jury in determining motive.

Nevertheless, the court's error in admitting C's testimony was harmless because that testimony was not the only evidence admitted that established a possible motive for the shooting, the testimony was not particularly relevant to establishing the elements of manslaughter in the first degree with a firearm, the state's case was otherwise relatively strong, and the court instructed the jury on the limited use of C's testimony.

The trial court correctly determined that there was not sufficient evidence to warrant the third-party culpability jury instruction that the defense requested because, contrary to the defendant's claim, there was not enough evidence to raise more than a bare suspicion that G, rather than the defendant, was the shooter.

The defendant was not entitled to a jury instruction on the adequacy of the police investigation into the victim's killing, as the evidence was not sufficiently compelling to mandate such an instruction, and defense counsel was afforded the opportunity to present evidence, to cross-examine the witnesses, and to argue to the jury about any deficiencies in the investigation.

State *v.* Dixon

In connection with the defendant's claim that the jury's finding of not guilty with respect to the charge of criminal possession of a firearm was inconsistent with its finding of guilty with respect to the charge of first degree manslaughter with a firearm, this court declined the defendant's request to modify its holding in *State* v. *Arroyo* (292 Conn. 558) to permit review of legally inconsistent verdicts, as this court continued to find the analysis in *Arroyo* persuasive, especially in light of its recent adherence to *Arroyo* in *State* v. *Henderson* (348 Conn. 648).

There was no merit to the defendant's claim that the evidence was insufficient to support his conviction of first degree manslaughter with a firearm, as the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt.

The jury reasonably could have inferred that the defendant's flight, in combination with other evidence, established consciousness of guilt, which, in turn, established the defendant's identity as the shooter, surveillance video footage placed the defendant at the scene of the shooting, G testified that the defendant had previously assaulted and robbed him, and G also testified that he saw the defendant with a gun moments before the victim was shot and that the gun was the same one the defendant was seen holding in a video that was created a few hours before the shooting.

(*Three justices concurring separately in one opinion*)

Argued February 6—officially released September 16, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the jury before *Blawie, J.*; verdict and judgment of guilty of the lesser included offense of reckless manslaughter in the first degree with a firearm, from which the defendant appealed to this court. *Affirmed*.

*Denis J. O'Malley III*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Paul Ferencek*, state's attorney, *Timothy F. Costello*, supervisory assistant state's attorney, and *Margaret Moscati* and *Elizabeth K. Moran*, assistant state's attorneys, for the appellee (state).

353 Conn. 382 SEPTEMBER, 2025 385

State *v.* Dixon

*Opinion*

McDONALD, J. The most significant issue raised in this appeal is whether the trial court properly allowed the state's gang expert to testify as to "neighborhoods," "neighborhood divisions," and the "dynamics" between neighborhoods in the city of Stamford, despite the fact that the prosecutor conceded that the defendant, Sirus Dixon, was not in a gang. The defendant also raises various other claims, including that the court failed to provide certain proposed jury instructions, the jury returned an inconsistent verdict, and there was insufficient evidence to sustain his conviction. Although we agree with the defendant that the admission of the testimony from the state's gang expert witness was improper, we conclude that this error was harmless. We also reject the defendant's other claims. Accordingly, we affirm the judgment of conviction.

One night in May, 2018, the victim, Antonio Robinson, who was eighteen years old at the time, and his friend, Tyrik Gill, were walking from Connecticut Avenue in Stamford to a home in the "Southfield Village" housing complex.[1] While under an Interstate 95 overpass on West Avenue, they encountered the fifteen year old defendant and his friends, seventeen year old Karl Davis and eighteen year old Jimmy Jean-Baptiste. Gill knew the defendant because the defendant, Davis, and another individual had previously attacked Gill as he walked home. When the teenagers encountered each other, Jean-Baptiste made a passing comment toward Gill and Robinson, but the two kept walking toward Southfield Village.

After walking a few feet past each other, Gill turned and saw the defendant pull a silver gun from his waist-

---

[1] The term "Southfield Village" was used at trial to describe the housing project located at Southwood Square apartments on Southwood Drive in Stamford. To be consistent with the trial record, we will use the terms "Southfield Village" and "the Village."

State *v.* Dixon

band. After seeing the gun, Gill tried to grab Robinson and run. As they ran, Gill heard a gunshot. Gill then saw Robinson fall, stand back up, and keep running. Once they crossed the street, Gill saw that Robinson was bleeding. Robinson then collapsed on the side of the road, and Gill asked a passerby to call 911, before running away. Gill returned to the scene before the police arrived and found Robinson lying by the curb. By the time the police arrived, Robinson was unresponsive, and he died shortly thereafter.

Meanwhile, the defendant, Davis, and Jean-Baptiste had also run from the scene of the shooting. Several surveillance cameras tracked their movements. The surveillance footage showed the three teenagers quickly crossing a supermarket parking lot. Additionally, Stamford Police Officer Vito Sileo testified that he observed three teenagers enter that lot from the same direction from which he had heard a gunshot. Sileo advised dispatch about the individuals and followed them, noting that they went behind stores next to the supermarket and proceeded toward Whitmore Avenue. Stamford Police Officer Logan Pavia and his canine partner were dispatched to the area. They tracked the defendant, Davis, and Jean-Baptiste to a residential backyard on Havemayer Lane.

The police tested the defendant's hands and clothes for gunshot residue particles. Analysis found lead—one of three elements that comprise gunshot residue—on the defendant's hands and jacket. Despite an exhaustive search that followed the path the three teenagers took from the scene of the shooting to where the defendant was arrested, the police did not recover a gun.

Over the course of several months following the shooting, the police conducted a series of interviews with Gill. The police first interviewed Gill the day after the shooting but failed to record the audio of the inter-

State *v.* Dixon

view. According to Christian DiCarlo, who, at the time of the interview, was a sergeant with the Stamford Police Department, Gill said that he "never saw who shot . . . Robinson" and did not know the males beneath the overpass. After the police showed him surveillance footage of the incident, however, Gill identified the defendant, Davis, and Jean-Baptiste. That same day, Gill returned for a second interview with the police, this time with audio recording enabled. Gill told the police, among other things, that he saw what looked like a chrome gun in the defendant's waistband. After a detective pulled out and showed his service weapon, which was a semiautomatic pistol, Gill said that the gun he saw in the defendant's waistband was also a semiautomatic. When asked whether he had ever been assaulted or robbed by the defendant prior to the incident, Gill stated that he had not.

Approximately two weeks after the shooting, Gill returned for another interview with the police and was represented by counsel. During this interview, Gill disclosed that, following the shooting, he ran to Southfield Village and back to the scene before the police arrived on the night of the incident. Gill and his attorney returned for a fourth and final interview several months later. During that interview, the police showed Gill an image of the defendant holding a revolver that the police had retrieved from Davis' cell phone. Despite his previous assertions that the gun in the defendant's waistband was a semiautomatic, after seeing the photograph, Gill told the police it was actually a revolver. Gill also informed the police, for the first time, that the defendant and two other individuals had jumped him and stolen his sneakers one month prior to the shooting. Gill then provided a written statement regarding the events, in which he mentioned, among other things, a "past . . . beef between the [W]est [S]ide and Conn[ecticut] Avenue" being potentially related to the incident because

State *v.* Dixon

Gill previously "lived in the [V]illage" but still had "friends on the [W]est [S]ide . . . ."

Thereafter, the state charged the defendant with murder in violation of General Statutes §§ 53a-8 and 53a-54a, and criminal possession of a firearm in violation of General Statutes (Rev. to 2017) § 53a-217 (a) (2). Following a trial, the jury found the defendant not guilty of murder and criminal possession of a firearm but guilty of the lesser included offense of reckless manslaughter in the first degree with a firearm. See General Statutes § 53a-55a. The defendant was sentenced to thirty-seven years of incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant contends that (1) the trial court violated his federal due process right to a fair trial and abused its discretion when it admitted a gang expert witness' testimony on "neighborhood" rivalries, (2) the trial court erroneously declined to instruct the jury on third-party culpability and investigative inadequacy, (3) the jury returned an inconsistent verdict when it found the defendant guilty of manslaughter with a firearm despite finding him not guilty of criminal possession of a firearm, and (4) the state failed to present sufficient evidence from which the jury could reasonably conclude that the defendant shot Robinson.[2] We address each claim in turn.

I

EXPERT TESTIMONY

We first address the defendant's claims related to the admission of the testimony of the state's gang expert

---

[2] The defendant also contends that, even if we do not conclude that any one of the issues in this appeal would lead to a finding of reversible error, the issues nonetheless collectively effect a cumulative harm requiring reversal of the defendant's conviction. Given our conclusion that the only evidentiary error was the admission of the gang expert's testimony, we need not reach the defendant's cumulative harm claim.

State *v.* Dixon

witness on "neighborhoods," "neighborhood divisions," and the "dynamics" between them. The defendant contends that the admission of this testimony violated his right to due process and constituted evidentiary error.

The following additional facts and procedural history are relevant to our analysis. Prior to the start of trial, the prosecutor informed the trial court that the state was not going to allege that the defendant was a member of a gang because it "ha[d] no information to indicate he was . . . ." During trial, however, the last witness the state called was Sergeant Bryan Cooper, the Stamford Police Department's "certified gang instructor," to testify as an expert witness. The foundation for Cooper's testimony was Gill's written statement to the police that mentioned a "beef between Connecticut Avenue [and] the West Side," and the testimony of Robinson's sister that the defendant was from Connecticut Avenue, which the prosecutor argued meant that the defendant "repp[ed]" that neighborhood.[3] For his part, Gill testified that he grew up in "the Village," which is part of the West Side.

Cooper was called as an expert to testify not on gangs per se, but on "Stamford neighborhoods, neighborhood divisions, and the dynamics between them." The prosecutor claimed that this testimony would be relevant to the prosecutor's theory that Robinson's shooting was motivated by "the Connecticut Avenue versus West Side Village dynamic." Specifically, the prosecutor's theory was that Gill had been the intended target, but the shot missed and killed Robinson. The prosecutor explained that "[the defendant] was a part of one neighborhood and . . . Gill was a part of another . . . ." Defense counsel objected to Cooper's testimony on the grounds

_____

[3] Specifically, when asked during direct examination if she knew the area of city the defendant was "associated" with, Robinson's sister responded, "Connecticut Avenue where, you know, where he's from, I guess."

State *v.* Dixon

that it was not relevant, overly prejudicial, and not a proper subject of expert testimony. Defense counsel noted that simply omitting the word "gang" does not change the prejudicial character of the testimony because the jury would understand the reference to "neighborhoods" to mean that Cooper was testifying about gangs.

The trial court overruled defense counsel's objection. It explained that, "even if we were using the 'gang' word, which we're not, which I think lessens its prejudicial impact, the courts have allowed this type of evidence." The court reasoned that Cooper's testimony was not to demonstrate the defendant's criminal propensity or bad character but was "highly probative of possible motive to kill . . . Gill."

During voir dire, outside the presence of the jury, Cooper explained that he had worked for the Stamford Police Department for ten years and was assigned to the Bureau of Criminal Investigations and Major Crimes Unit. When asked whether he had ever received any training, Cooper stated that he had attended training sessions that were conducted by the Narcotic Enforcement Officers Association, part of which "was gang training." Cooper also noted that he was "currently . . . the certified gang instructor for the Stamford [Police Department]." He explained that, "[as] [p]art of [the Police Officer Standards and Training Council (POSTC)] curriculum, we talk about the national gangs across the country, so I teach that to officers. And then I also specifically focus on the local neighborhood associations in Stamford and any gang association that's with it." As to the neighborhood associations, Cooper explained that, "[d]epending on where you currently live, where you grew up or who you associate with, you might align with a certain neighborhood association . . . ." He also stated that the Connecticut Avenue area had a "large demographic of Haitians . . . [and] Spruce Street

State *v.* Dixon

[had] . . . Hispanic and Black [residents], some Jamaicans, some Haitians, depending on the area.''

At the conclusion of Cooper's voir dire, defense counsel again objected to Cooper's testimony. The trial court again overruled the objection. It explained, ''[t]he case law is quite clear that evidence of gang affiliation is admissible and relevant and probative on the issue of motive. . . . [A]ll crimes have a motive, and this one, I believe, given the testimony from the witnesses, is related somehow to a neighborhood riff. And, if [Cooper] confines his descriptors to the [term] 'neighborhoods,' rather than the word 'gang,' I think it actually lessens any prejudicial impact . . . .''

During his direct examination in the presence of the jury, Cooper reiterated his qualifications as a member of the Stamford Bureau of Criminal Investigations and the Major Crimes Unit, his training with POSTC, and that he is ''currently . . . the certified gang instructor for the Stamford [Police Department].'' When asked whether he had undergone any training specific to Stamford neighborhoods, Cooper responded that, in addition to his experience with narcotics, he ''did go through the POSTC certified basic certification course. During that course, you had to build a curriculum based on both national gangs, and then, [of] course, I also teach our officers specifically Stamford neighborhood current and past beef[s] and alignments.'' He also testified that he had developed relationships within the community through which he learned of ''[l]arge-scale drug trafficking within the city. Large-scale firearm[s] trafficking. Also, we've been able to . . . solve . . . homicides, shootings, serious assaults and robberies.''

Cooper also learned ''what neighborhoods align with other neighborhoods, what neighborhoods get along with other neighborhoods, and what neighborhoods don't get along with each other.'' He explained that

State *v.* Dixon

"rep[ping]" a particular neighborhood means "[t]hat you're aligned with that neighborhood, whether it's crim[inal] activity or noncriminal activity." Cooper testified that one faction of the "West Side" of Stamford is comprised of Spruce Street, Richmond Hill and Rose Park. Cooper explained that, at the time of the shooting, "the South End, like Pacific and Ludlow, didn't get along with Southwood Square Housing Complex. Also, Spruce Street, Rose Park, [and] Richmond Hill, they refer to themselves as D-1 Boys, they were in an ongoing beef with Connecticut Avenue/Myano Lane, [and] they refer to themselves as GB Money Dollar Sign A . . . . That beef had been going on since 2014, had led to numerous shootings and shots fired incidents over the years." He further testified that, if someone who associates with the West Side, either directly or through a friend, went to Connecticut Avenue, there would be a "[b]ig problem." Finally, Cooper noted that, after the shooting at issue, the dynamics of the neighborhoods changed, "Connecticut Avenue/Myano Lane were no longer aligned with Southwood Square, and now Southwood Square is more aligned with Spruce Street."

During her closing argument, the prosecutor emphasized that Cooper's testimony established a motive— which was "loyalty, territories, a neighborhood beef. . . . And the evidence is there for [the jurors], that this was over a neighborhood beef. The defendant repped Conn[ecticut] Ave[nue]. Those were his friends. Those were where his loyalties lie. [Robinson and Gill] did not. That was enough, [that] was all it took for there to be bad blood between the two of them. And . . . Cooper [stated that the night of the shooting] changed the dynamics of that neighborhood."

A

We begin with the defendant's constitutional claim that Cooper implicitly invoked racial stereotypes when

State *v.* Dixon

he characterized the Black residents of certain Stamford neighborhoods as being engaged in firearms and drug trafficking, and associated violent crime simply because they lived in those neighborhoods. The defendant contends that the state secured a conviction "based on Cooper's implicit invocation of racial stereotypes about Black neighborhoods being dangerous, criminal hotbeds, and the young Black males who live there being violent 'super predators.' " The defendant contends that the admission of this testimony violated his due process right to a fundamentally fair trial free from racial bias. The state contends that Cooper did not inject racial bias into the trial because he "never testified before the jury about the demographics of the neighborhoods . . . ." As a result, the state contends, "the jury never heard that any [of the] neighborhoods had Black majorities."[4] We agree with the state.

This court has recognized that an evidentiary error may be constitutional in nature if "there is a resultant denial of fundamental fairness or the denial of a specific constitutional right . . . ." (Internal quotation marks omitted.) *State* v. *Toccaline*, 258 Conn. 542, 550, 783 A.2d 450 (2001); see also, e.g., *State* v. *Crespo*, 303 Conn. 589, 609 n.15, 35 A.3d 243 (2012). "This is consistent with federal jurisprudence, which recognizes that an evidentiary error may be of constitutional magnitude if the error was so pervasive as to have denied [the defen-

_____

[4] The state also argues that the defendant failed to preserve his constitutional claim that the admission of Cooper's testimony violated his due process right to a fundamentally fair trial free from racial bias. It is undisputed, however, that defense counsel did object, on several occasions, to the admission of Cooper's testimony on evidentiary grounds. Accordingly, we conclude that this claim is adequately preserved. Cf. *State* v. *Turner*, 334 Conn. 660, 673, 224 A.3d 129 (2020) (constitutional claim arising from evidentiary error can be preserved by "objecting to [the witness'] testimony"). The state acknowledges that, even if it were not adequately preserved, this claim would be reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

State *v.* Dixon

dant] a fundamentally fair trial . . . . [T]he standard
. . . [is] whether the erroneously admitted evidence,
viewed objectively in light of the entire record before
the jury, was sufficiently material to provide the basis
for conviction or to remove a reasonable doubt that
would have existed on the record without it. In short
it must have been crucial, critical, [and] highly signifi-
cant . . . .'' (Internal quotation marks omitted.) *State*
v. *Turner*, 334 Conn. 660, 674, 224 A.3d 129 (2020).
However, ''[r]obing garden variety claims [of an eviden-
tiary nature] in the majestic garb of constitutional
claims does not make such claims constitutional in
nature . . . .'' (Internal quotation marks omitted.)
*State* v. *Elmer G.*, 333 Conn. 176, 201, 214 A.3d 852
(2019).

Despite the defendant's contention to the contrary,
Cooper never testified before the jury regarding the
demographics of the neighborhoods at issue. Cooper
testified about demographics only during voir dire, out-
side the presence of the jury. During that testimony,
Cooper stated that the Connecticut Avenue area had a
''large demographic of Haitians . . . [and] Spruce
Street [had] . . . Hispanic and Black [residents], some
Jamaicans, some Haitians, depending on the area.'' That
testimony was not repeated before the jury. The defen-
dant has not identified, and our review of the record
has not uncovered, any instance in which Cooper dis-
cussed the demographics of the neighborhoods, or race
in general, in the presence of the jury. Moreover, although
the defendant characterizes Cooper's testimony as call-
ing on racial stereotypes regarding young Black males
being violent '' 'super predators,' '' there is nothing in
the record to support such a characterization. Indeed,
the defendant does not explain how Cooper's testimony
before the jury even implied that the neighborhoods
had Black majorities. It is true that Cooper generally
testified that he had learned of large-scale firearms and

State *v.* Dixon

drug trafficking "within the city." But Cooper never explicitly connected that conduct to specific neighborhoods or to the Black residents of those neighborhoods. Viewed in context, we cannot conclude that any of Cooper's testimony supports the defendant's claim that Cooper injected racial stereotypes into the trial.

We emphasize that prosecutors and trial judges must be ever mindful to guard against the possibility of ethnic stereotyping, deliberate or not, implicit in Cooper's voir dire testimony relating to the city's "demographics . . . ." Implicit bias is, by its nature, a pervasive problem that one must be mindful of or else succumb to its negative effects. See, e.g., J. Kang & K. Lane, "Seeing Through Colorblindness: Implicit Bias and the Law," 58 UCLA L. Rev. 465, 473 (2010) ("Implicit biases—by which we mean implicit attitudes and stereotypes—are both pervasive (most individuals show evidence of some biases), and large in magnitude, statistically speaking. In other words, we are not, on average or generally, cognitively colorblind."). In this case, however, the jurors were instructed to recognize their own implicit biases and to remove them from their consideration of an accused person's culpability. The trial court also instructed the jurors on techniques they could use to check whether any unconscious biases were influencing their decision-making. Moreover, the defendant concedes that "the issue [in this case] was not implicit bias but explicit bias introduced under the false imprimatur of expert testimony." As we explained, however, nothing in Cooper's testimony before the jury supports the defendant's contention that Cooper injected explicit bias by testifying regarding racial stereotypes.

B

Having concluded that the defendant's claim regarding Cooper's expert testimony is not constitutional in nature, we now turn to the question of whether the admis-

State *v.* Dixon

sion of his testimony was evidentiary error because, as the defendant contends, the evidence was not relevant, was unduly prejudicial, and constituted improper propensity evidence. We agree with the defendant but conclude that the error was harmless.

"We review a trial court's decision to preclude [or admit] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Even [i]f we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party. . . .

"The standards for admitting expert testimony are well established. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . . [See] Conn. Code Evid. § 7-2 ([a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue). . . . [T]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to

State *v.* Dixon

the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 269–70, 269 A.3d 104 (2022). We are mindful, however, that an expert witness may not serve as a conduit for otherwise inadmissible propensity evidence. See, e.g., *Williams* v. *Illinois*, 567 U.S. 50, 80–81, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (''[T]rial courts can screen out experts who would act as mere conduits for hearsay . . . . [E]xperts are [also] generally precluded from disclosing inadmissible evidence to a jury.'' (Citation omitted.)).

Here, it is evident that Cooper's ''neighborhood'' testimony was used as a euphemistic term that enabled Cooper to testify about gang activity in neighborhoods within Stamford, something the prosecutor conceded the state had no evidence of regarding the defendant.[5] We agree with the defendant that, contrary to Cooper's testimony, a ''neighborhood'' does not engage in ''crim[i-nal] activity,'' or ''[l]arge-scale drug'' and ''firearm[s] trafficking'' or ''homicides, shootings, serious assaults and robberies.'' Moreover, neighborhoods do not refer to themselves with names like ''D-1 Boys'' or ''GB Money Dollar Sign A.'' Neighborhoods do not ''align'' with other neighborhoods to conduct criminal activity, and they do not have ''beef[s]'' with other neighborhoods that ''[lead] to numerous shootings and shots fired incidents

---

[5] The state flatly asserts that ''Cooper . . . did not testify regarding gang affiliations. Instead, he explained only interneighborhood divisions . . . .'' The state goes on to argue, however, that, ''[e]ven if Cooper's testimony was about gang affiliation, it was highly probative of motive and, therefore, outweighed the potential for undue prejudice.'' (Internal quotation marks omitted.) For the reasons explained subsequently in this opinion, we disagree.

State *v.* Dixon

. . . .'' Neighborhoods, rather, are where people live. If resort to this transparent euphemism were not enough to make plain the purpose of Cooper's testimony, Cooper himself testified before the jury that he was the Stamford Police Department's ''certified gang instructor . . . .'' When asked whether he had undergone any training specific to Stamford neighborhoods, Cooper responded that he ''did go through the POSTC certified basic certification course. During that course, you had to build a curriculum based on both *national gangs*, and then, [of] course, I also teach our officers specifically Stamford neighborhood current and past beef[s] and alignments.'' (Emphasis added.) Cooper did not actually identify any specific training he received regarding Stamford neighborhoods.[6] Rather, his testimony focused on this training related to gangs. As a result, we have little trouble concluding that it would have been readily apparent to the jury that Cooper's testimony regarding ''Stamford neighborhoods, neighborhood divisions, and the dynamics between them'' was really a reference to gang membership and activity, or at least the functional equivalent. The state cannot acknowledge that a defendant is not a member of a gang and simultaneously present expert testimony about gangs dressed up in the rubric of neighborhood associations. Put simply, substituting the word ''neighborhood'' for the word ''gang'' does not render the inadmissible evidence admissible.[7]

---

[6] When asked by the prosecutor whether he had undergone ''any training specific to Stamford neighborhoods,'' Cooper identified only the POSTC training, which was not specific to Stamford neighborhoods. He clarified that ''a lot of my training is based on my intimate knowledge in narcotics, my relationship with confidential informants, cooperating witnesses, and certain citizens.''

[7] We note that the state has not identified, and our research has not revealed, a single appellate case throughout the country in which a ''neighborhood'' expert was permitted to testify in a criminal trial. In *State* v. *Tomlinson*, 340 Conn. 533, 264 A.3d 950 (2021), the state's gang expert testified that ''gangs in Bridgeport are unique; they are not organized but, instead, are *neighborhood based* with certain gangs controlling different

353 Conn. 382     SEPTEMBER, 2025     399

State *v.* Dixon

It is true, as the trial court noted, that this court has concluded that testimony regarding gang affiliation is admissible when certain evidentiary requirements are satisfied. See, e.g., *State* v. *Jones*, 351 Conn. 324, 333, 330 A.3d 118 (2025); *State* v. *Bermudez*, 341 Conn. 233, 250–52, 267 A.3d 44 (2021); *State* v. *Wilson*, 308 Conn. 412, 430–31, 64 A.3d 91 (2013); see also, e.g., *State* v. *Crocker*, 83 Conn. App. 615, 640, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004). One such instance is when gang affiliation is relevant to motive. See, e.g., *State* v. *Wilson*, supra, 430 (properly admitting gang evidence to establish motive for killing). But we also recently cautioned courts to "carefully evaluate [the] probative value [of gang affiliation evidence] to ensure that it is sufficiently significant to overcome the potential for unfair prejudice." *State* v. *Jones*, supra, 333. We have also explained that "courts must exercise caution whenever the state seeks to admit evidence of a defendant's affiliation with a gang" because gangs and gang activity invoke images of criminal behavior. *State* v. *Bermudez*, supra, 250.

In the present case, the prosecutor conceded that the state "ha[d] no information to indicate" that the defendant was a member of a gang. For this reason, Cooper's testimony as an expert had limited probative value and was largely irrelevant. See Conn. Code Evid. § 4-1 (evidence is relevant if it has any "tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence"). The state also acknowledged at oral argument before this court that Cooper's testimony regarding large-scale drug and firearms trafficking was not relevant to this

areas of the city based on where the members are from." (Emphasis added.) Id., 544. The expert in *Tomlinson*, however, did not purport to testify about neighborhoods but, rather, about "neighborhood based . . . gangs . . . ." Id.

State *v.* Dixon

case. Indeed, gang expert testimony has been deemed relevant and admissible only when there is some evidence to indicate that the defendant is actually a member of a gang. See, e.g., *State* v. *Crocker*, supra, 83 Conn. App. 633 (gang expert testimony was relevant when defendant told police "he was a member of the Island Brothers gang"); see also, e.g., *Williams* v. *Illinois*, supra, 567 U.S. 81 ("if the prosecution cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact"). There is, of course, no such evidence in the present case, and the state does not contend otherwise.

To the extent there was any probative value as to motive given the defendant's connection to Connecticut Avenue, it was plainly "outweighed by the danger of unfair prejudice . . . ." Conn. Code Evid. § 4-3. "There is no question that evidence of a defendant's gang affiliation is potentially prejudicial and inflammatory, as it poses the risk that the jury will associate gang membership with a propensity for committing crimes and find the defendant guilty by association." *United States* v. *Ozuna*, 674 F.3d 677, 681 (7th Cir. 2012); see also, e.g., *United States* v. *McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005) ("[although] [e]vidence of gang membership is admissible if relevant to a disputed issue . . . gang affiliation evidence is not admissible [when] it is meant merely to prejudice the defendant or [to] prove his guilt by association with unsavory characters" (citation omitted; internal quotation marks omitted)), cert. denied sub nom. *McKoy* v. *United States*, 547 U.S. 1174, 126 S. Ct. 2345, 164 L. Ed. 2d 859 (2006), and cert. denied, 549 U.S. 828, 127 S. Ct. 46, 166 L. Ed. 2d 48 (2006). We have "emphasized that under no circumstances should [gang affiliation] evidence be admitted to demonstrate a defendant's criminal propensity or

State *v.* Dixon

bad character.'' *State* v. *Jones*, supra, 351 Conn. 333. But, with no evidence of gang affiliation, Cooper's testimony did little more than arouse the ''deep, bitter and widespread prejudice against street gangs.'' (Internal quotation marks omitted.) *People* v. *Cruz*, 164 Ill. App. 3d 802, 812, 518 N.E.2d 320 (1987), appeal denied, 121 Ill. 2d 574, 526 N.E.2d 834 (1988). This is especially applicable in this case because DiCarlo already had testified extensively regarding the geography and neighborhoods surrounding the shooting. He also had testified that there was ongoing conflict between Connecticut Avenue and the West Side. Thus, Cooper's testimony simply made explicit that the state believed the shooting was motivated by the defendant's alleged affiliation with the ''GB Money Dollar Sign A'' gang and its ongoing ''beef'' with the ''D-1 Boys.'' Accordingly, we conclude that the trial court abused its discretion when it permitted Cooper's expert testimony.

The concurrence agrees that the ''evidence relating to neighborhood beefs is akin to local gang disputes and should be considered as such for admissibilitypurposes . . . .'' (Internal quotation marks omitted.) And, although the concurrence does not dispute the fact that the prosecutor readily conceded that the defendant was not a member of a gang, it nevertheless takes the incongruous position that ''there was a sufficient factual basis on which the [trial] court could have reasonably concluded that the portion of Cooper's testimony relating to Stamford neighborhoods and neighborhood beefs was a proper subject for expert testimony.''[8] The concurrence reasons that testimony from Gill, DiCarlo, and

[8] The concurrence, however, does agree with us that the trial court ''abuse[d] its discretion by failing to limit the scope of Cooper's testimony, particularly relating to his relationships in the community and information about large-scale drug and firearms trafficking, because such testimony . . . was far more prejudicial than probative.'' Text accompanying footnote 1 of the concurring opinion. The concurrence also agrees that this error was harmless.

State *v.* Dixon

Robinson's sister established the factual foundation for Cooper's expert testimony. It appears to reason that, on one hand, "neighborhood" experts are just gang experts by another name, but, on the other hand, it does not matter that the prosecutor conceded that the defendant was not in a gang because the evidence of the "neighborhood beefs" is relevant to motive and was, therefore, the proper subject of expert opinion. We disagree. First, we note that the argument advanced by the concurrence was never one that was advanced by the parties in this appeal; the state does not contend, even in the alternative, that only certain portions of Cooper's testimony were admissible. It does not contend that the trial court's ruling could be spliced into different components when determining the admissibility of Cooper's testimony. In fact, unlike the concurrence, the state disputes the notion that Cooper's testimony was related to gangs at all.

Second, we disagree with the concurrence that there was a sufficient factual basis for Cooper's testimony given the limited evidence regarding the defendant's alleged involvement with Connecticut Avenue. The only evidence that connected the defendant to Connecticut Avenue was the testimony from Gill and Robinson's sister that "Connecticut Avenue [was] where, you know, where [the defendant is] from, I guess." But, as Cooper conceded, one does not need to physically live in a particular neighborhood to "rep" the neighborhood and one can physically live in a neighborhood without "rep[-ping]" it. In his written police statement, Gill stated that, "[i]n the past, there has been beef between the [W]est [S]ide and Conn[ecticut] Avenue." Gill's statement, however, did not indicate that the defendant "repped" Connecticut Avenue. It is true that Robinson's sister testified that, although she did not know where the defendant was living at the time of the shooting, that night she referred to the three teenagers running

State *v.* Dixon

through the parking lot as the "Conn. Ave. boys," which she testified meant that they "rep[ped]" the neighborhood. But she did not testify as to what she meant by "rep[ping]" a neighborhood. Cooper explained that "rep[ping]" a particular neighborhood means "[t]hat you're aligned with that neighborhood, whether it's crim[inal] activity or *noncriminal activity.*" (Emphasis added.) Thus, even if Robinson's sister and Cooper had the same understanding of the meaning of "rep," that does not mean that the defendant was therefore engaged in criminal activity with Connecticut Avenue. This, of course, is in addition to the prosecutor's concession that the state "ha[d] no information to indicate" that the defendant was a member of a gang. If a neighborhood affiliation operates as a gang, why did the prosecutor concede that the defendant was not in a gang? Taken together, we cannot agree that there was a sufficient factual basis to support Cooper's testimony.

Third, even if there was a sufficient factual basis for Cooper's testimony, contrary to the concurrence's assertion, Cooper's testimony was not the proper subject of expert testimony simply because it related to motive. It is true that the past interaction between the defendant and Gill was relevant to establish a possible motive. But that is factual evidence that is, and was, properly developed through *fact* witnesses, not *expert* witnesses. For example, Gill testified that the defendant had assaulted him one month before the shooting. Robinson's sister testified that the defendant was affiliated with Connecticut Avenue, which could serve as a motive for the shooting. DiCarlo testified that he was able to determine a possible motive through his investigation. He explained that the defendant had assaulted and robbed Gill one month prior to the shooting and that there was ongoing "beef" between Connecticut Avenue and the West Side. As it related to the area of the shooting or the neighborhoods, the admissible

State *v.* Dixon

portion of Cooper's testimony was or could have been included in DiCarlo's testimony as a fact witness. Yet, Cooper was deemed an expert, with ten years of experience with the Stamford Police Department, and DiCarlo was not, despite being a twenty-six year veteran of the same police department. Indeed, when asked if he was familiar with "the downtown area of Stamford," DiCarlo responded, "[p]retty familiar. I spent twenty-six years down there." DiCarlo testified extensively about the geography and neighborhoods in the area of the shooting and the dynamics between the neighborhoods. As a result, the state was able to present evidence, properly through fact witness testimony, to establish a possible motive for the shooting. The only difference between Cooper and DiCarlo—aside from DiCarlo having more than two and one-half times more experience in Stamford law enforcement than Cooper—was Cooper's gang training. The juxtaposition between the testimony of DiCarlo and Cooper only serves to highlight the improper nature of Cooper's testimony because it was simply gang related information repackaged and reimagined, and euphemistically labeled, as "neighborhood beefs" by Cooper based on his gang training.

There is no dispute that Cooper did not have any training specific to Stamford neighborhoods. He was a certified gang expert. Because the prosecutor conceded that the defendant was not a member of a gang, the only basis on which Cooper's expert "neighborhood" testimony would be admissible is his relatively limited experience patrolling Stamford in the ordinary course of performing his routine job functions.[9] To be clear, there was no evidence presented at trial that Cooper has any admissible "*peculiar* knowledge or experience, not common to the world" that would aid the jury in determining a possible motive. (Emphasis added; inter-

_____
[9] Cooper did not hold a senior leadership position within the department, for example, being a lieutenant, captain or assistant chief.

State *v.* Dixon

nal quotation marks omitted.) *State* v. *Fisher*, supra, 342 Conn. 269. As already noted, Cooper did not possess any greater knowledge than DiCarlo regarding Stamford neighborhoods. If Cooper's experience patrolling Stamford was sufficient to qualify him as a "neighborhood" expert, it is hard to imagine why a person who has resided in Stamford for, say, thirty years, or even the mayor, would not also qualify as an expert on the city's neighborhoods. Thus, in the context of this case, we disagree that the term "neighborhood experts" is meaningfully distinct from the phrase "gang experts." Given the prosecutor's concession that the defendant was not a member of a gang, any attempt to work around this fact is really just an effort to shoehorn expert gang testimony into the trial by another name. We conclude that any limited probative value was strongly outweighed by the danger of unfair prejudice.

Having concluded that the trial court abused its discretion, we must now determine whether that error was harmful. See, e.g., *State* v. *Bouknight*, 323 Conn. 620, 626–27, 149 A.3d 975 (2016) ("a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict" (internal quotation marks omitted)). Cooper's testimony helped to more clearly frame a possible motive. But Cooper's testimony was not the only evidence regarding a possible motive. DiCarlo also testified regarding a possible motive, which was that "there was a beef between [Gill] and [the defendant] where [Gill] was beat up and robbed of his sneakers."

Moreover, although helpful to establish a possible motive, Cooper's testimony was not particularly important to establishing the elements of reckless manslaughter in the first degree with a firearm, and the state's case was otherwise relatively strong. The defendant's identity was readily established through eyewitness testimony, surveillance video that placed the defendant at the scene of the

State *v.* Dixon

shooting, and the fact that he was tracked by a police canine to a nearby residential lot, where he was found hiding behind a fence, lying on the ground between two trees in the house's backyard, with Davis and Jean-Baptiste. A video extracted from Davis' cell phone, taken approximately two and one-half hours before the shooting, depicts the defendant holding a gun, which Gill testified was the same gun used in the shooting. In the video, the defendant can be seen wearing distinctive jeans with holes and bleached areas in the front. Surveillance footage recorded the defendant wearing the same jeans minutes before the shooting. Robinson's sister also recalled the defendant wearing a "bomber jacket" while he crossed through the supermarket parking lot following the shooting. Later that night, near where the police had located the defendant hiding, the police discovered a discarded green bomber jacket.

Moreover, as explained, the state relied on Cooper's testimony largely to establish motive. But motive is not an element of the charged offense, and the state was able to establish the defendant's intent from the evidence that the defendant shot at Gill and Robinson in close proximity. "Ordinarily, intent can . . . be inferred [only] by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 504, 180 A.3d 882 (2018). Gill testified that he saw the defendant pull a gun out of his waistband and that, five to ten seconds later, Robinson was shot. Moreover, when asked whether the police investigation uncovered a motive, DiCarlo testified that it did.[10] He also

_____

[10] The defendant contends that the trial court sustained defense counsel's objection to DiCarlo's testimony regarding what Gill had told the police on September 8, 2018. We disagree. The record makes clear that defense counsel objected to the prosecutor's question to DiCarlo regarding motive, the court heard the objection outside the presence of the jury and ultimately overruled

State *v.* Dixon

testified that "Gill stated that there was an ongoing beef between Connecticut Avenue and the West Side. He was originally living on the West Side in the Village and had recently moved over to Conn[ecticut] Avenue. . . . [T]here was a beef between him and [the defendant] where he was beat up and robbed of his sneakers." Given the weight of the evidence and the fact that Cooper's testimony was not the only evidence of motive, we have a fair assurance that Cooper's improperly admitted testimony did not substantially affect the verdict.

Finally, we note that the trial court instructed the jury on the limited use of Cooper's testimony. Cf. *State* v. *Collins*, 299 Conn. 567, 590, 10 A.3d 1005 ("we find significant in mitigating any possible prejudice the limiting instructions . . . given by the trial court both during the testimony of relevant witnesses and during the final jury charge, which we presume the jury to have followed in the absence of any indication to the contrary" (citation omitted)), cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). Specifically, the court explained, "expert testimony is permitted to assist you in your deliberations. No such testimony is binding [on] you and . . . you may disregard this testimony either in whole or in part. It is for you to consider this testimony with the other circumstances in the case and, using your best judgment, determine whether you will give any weight to it and, if so, what weight you will give to it. The testimony is entitled to such weight as you find the expert's qualifications in his or her field entitle it to receive." Accordingly, we conclude that the admission of Cooper's expert testimony did not harm the defendant because we are confident that it "did not substantially affect the verdict." (Internal quotation

the objection and allowed DiCarlo to answer the question. The court subsequently sustained defense counsel's objection to a question from the prosecutor regarding the import of a person from one neighborhood entering another.

State *v.* Dixon

marks omitted.) *State* v. *Bouknight*, supra, 323 Conn. 626–27.

## II

## JURY INSTRUCTIONS

## A

The defendant next claims that the trial court erroneously declined to instruct the jury on third-party culpability. We disagree.

The following additional facts and procedural history are relevant to our analysis. Prior to the start of trial, the defendant filed a notice of intent to argue third-party culpability. He argued that Gill may have been the shooter because (1) Gill had a revenge motive to shoot the defendant based on the alleged prior assault and robbery, and (2) Gill's flight from the scene reflected consciousness of guilt and gave him an opportunity to hide the gun. The defense's request to charge urged the trial court to instruct the jury on third-party culpability. Based on Connecticut Criminal Jury Instructions 2.6-10, the defense asked the court to instruct the jury, among other things, that "[i]t is up to you, and you alone, to determine whether any of this evidence, if believed, tends to directly connect a third party to the crime[s] with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that the alleged third party . . . may be responsible for the crime[s] the defendant is charged with committing, then it would be your duty to [return] a verdict of not guilty . . . ." See Connecticut Criminal Jury Instructions 2.6-10, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited September 12, 2025). The prosecutor argued that the instruction was not appropriate because the third-party evidence was not "direct evidence . . . ." She noted

State *v.* Dixon

that much of the evidence regarding Gill highlighted in the defendant's request had not been admitted at trial. She also observed that there was no evidence that Gill possessed a gun. The court concluded there was not "sufficient evidence to warrant a third-party culpability instruction" and, therefore, denied the request.

"In determining whether the trial court improperly [declined] a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) *State* v. *Schovanec*, 326 Conn. 310, 318–19, 163 A.3d 581 (2017).

We have previously stated that "the very standards governing the admissibility of [third-party] culpability evidence also should serve as the standards governing a trial court's decision of whether to submit a requested [third-party] culpability charge to the jury." *State* v. *Arroyo*, 284 Conn. 597, 608–609, 935 A.2d 975 (2007). As to the admissibility of third-party culpability evidence, a defendant must "present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime . . . ." (Internal quotation marks omitted.) Id., 609. "[E]vidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant

State *v.* Dixon

committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination.'' Id., 609–10.

''We note that, although *Arroyo* did not expressly state a particular standard of review for claims of instructional error related to third-party culpability, this court has previously reviewed such claims under an abuse of discretion standard.'' *State* v. *Ashby*, 336 Conn. 452, 498, 247 A.3d 521 (2020).

Here, the defendant argues that the evidence established a '' 'direct connection' '' between Gill and the shooting because it established Gill's motive to seek revenge for the earlier assault and an opportunity because he was there. We disagree that there was sufficient evidence to raise more than a bare suspicion that Gill was the shooter. As to the defendant's contention that Gill had a motive to shoot the defendant because of the earlier assault and robbery, we have said that ''[i]t is not enough to show that another [individual] had [a] motive to commit the crime . . . .'' (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634–35, 1 A.3d 1051 (2010); accord *State* v. *Arroyo*, supra, 284 Conn. 609. Similarly, the defendant's argument that Gill was present at the scene of the shooting is also unavailing. Unlike the evidence introduced against the defendant, there is no evidence that Gill possessed a handgun. The defendant's argument boils down to, ''he was there . . . .'' But a third party's mere presence during the crime is not itself sufficient to require a third-party culpability instruction. See, e.g., *State* v. *Baltas*, 311 Conn. 786, 811–14, 91 A.3d 384 (2014) (no direct connection was established when third party's presence did not provide credible, alternative explanation for substantial forensic evidence against defendant). Although we understand the defendant's contention regarding the combined effect of Gill's potential motive and pres-

State *v.* Dixon

ence at the scene, we cannot conclude that the trial court incorrectly concluded that there was not sufficient evidence to warrant a third-party culpability instruction.

B

The defendant also claims that the trial court erroneously declined to instruct the jury on the adequacy of the police investigation. The defense asked the court to provide the instruction in both its request to charge and during the charge conference. Pursuant to Connecticut Criminal Jury Instructions 2.6-13, the defense requested, among other things, that the court instruct the jurors that, "[i]f you find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state . . . ." As evidence of investigative inadequacy, the defense relied on the lack of gunshot residue testing of Gill's hands and clothing and the failure by the police to record Gill's initial statement to them. The court declined to instruct the jury, reasoning that it did not "see enough inadequacies to warrant a charge on the police investigation." The court noted, however, that defense counsel was "free to argue what [the defense] believe[d] were certain aspects of the case that might create a reasonable doubt as to what the police did or didn't do."

On appeal, the defendant contends that the instruction was warranted given the investigator's failure to recover the gun, to search for the gun along the path Gill took when he fled the scene, to meaningfully question Gill on the night of the shooting, to perform gunshot residue tests on Gill, and to collect evidence from Gill the night of the shooting. We disagree.

We begin with the relevant legal principles. We have explained that, "[i]n the abstract, whether the [state] conducted a thorough, professional investigation is not

State *v.* Dixon

relevant to what the jury must decide: Did the defendant commit the alleged offense? Juries are not instructed to [find] the defendant [not guilty] if the [state's] investigation was superficial. Conducting a thorough, professional investigation is not an element of the [state's] case. . . . A defendant may, however, rely [on] relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 599–600. Our case law "does not require a court to instruct the jury on the quality of police investigation, but merely holds that a court may not preclude such evidence and argument from being presented to the jury for its consideration.'' (Internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 835 n.7, 256 A.3d 131 (2021). We review a trial court's decision not to instruct on investigative inadequacy for abuse of discretion. See, e.g., *State* v. *Ashby*, supra, 336 Conn. 497–98.

In *Collins*, this court rejected the defendant's challenge to the trial court's jury instruction, which provided "that the ultimate issue before you is not the thoroughness of the investigation or the competence of the police. The ultimate issue you have to . . . determine is whether the state in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged.'' (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 600. We concluded that "this instruction did not mislead the jury or violate the defendant's right to present a defense because it did not direct the jury not to consider the adequacy of the investigation as it related to the strength of the state's case, or not to consider specific aspects of the defendant's theory of the case.'' Id., 600–601.

353 Conn. 382 SEPTEMBER, 2025 413

State *v.* Dixon

Here, the trial court declined to instruct the jury on the adequacy of the police investigation. But the court expressly permitted defense counsel to argue to the jury the weaknesses in the investigation. As in *Collins*, the trial court never instructed the jury that it could *not* consider the adequacy of the police investigation. The defendant "was not deprived [of] the right to a fair trial because he was given the opportunity to present evidence and [to] cross-examine the state's witnesses regarding the adequacy of the police investigation." *State* v. *West*, 167 Conn. App. 406, 415, 142 A.3d 1250 (2016). The defendant does not contend otherwise for good reason. Among other things, defense counsel extensively cross-examined DiCarlo regarding his failure to obtain any potential evidence from Gill and other investigative inadequacies.

Moreover, the relevant evidence in the present case was not sufficiently compelling that it mandated the trial court to provide the instruction. As we have explained, a defendant "does not have an unfettered right to elicit evidence regarding the adequacy of the police investigation," and a defendant "must do more than simply seek to establish that the police could have done more." *State* v. *Wright*, 322 Conn. 270, 284, 140 A.3d 939 (2016). Defense counsel was free to argue—and did in fact argue—that there were deficiencies in the investigation that raised the "specter of reasonable doubt . . . ." *State* v. *Collins*, supra, 299 Conn. 600. Accordingly, we conclude that the jury was not misled, and the defendant was not entitled to a charge on the quality of the police investigation.

III

INCONSISTENT VERDICT

We next turn to the defendant's claim that the jury returned an inconsistent verdict when it found the defendant guilty of manslaughter with a firearm despite

State *v.* Dixon

finding him not guilty of criminal possession of a firearm. The defendant correctly notes that the parties drafted a stipulation for purposes of the charge of criminal possession of a firearm, stating that the defendant previously had been convicted of a serious juvenile offense. This stipulation was admitted as an exhibit. The defendant contends that, as a result of the stipulation, the only element remaining with respect to the charge of criminal possession of a firearm was whether the defendant possessed a firearm. It is the inconsistency between the finding of not guilty of criminal possession of a firearm and the finding of guilty of manslaughter with a firearm that the defendant now challenges on appeal. The defendant recognizes our holding in *State* v. *Arroyo*, 292 Conn. 558, 561, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), that "claims of legally inconsistent verdicts are not reviewable." The defendant, however, asks us to exercise our inherent supervisory authority to review his claim and to modify our holding in *Arroyo* in cases in which "a binding stipulation resolves all but one element of a count in the information," "[t]hat element also appears in another count of the information (a dependent offense)," and "[a]n acquittal of the single element predicate offense . . . [n]egate[s] the common element for purposes of the dependent offense . . . ." We decline to do so.

In *Arroyo*, we joined a majority of jurisdictions holding that "claims of legal inconsistency between a conviction and an acquittal are not reviewable." *State* v. *Arroyo*, supra, 292 Conn. 586. In reaching this conclusion, we found the United States Supreme Court's reasoning in *United States* v. *Powell*, 469 U.S. 57, 65, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984), persuasive and adopted the rule articulated: "[I]nconsistent verdicts . . . should not necessarily be interpreted as a windfall to the [prosecution] at the defendant's expense. It is

State *v.* Dixon

equally possible that the jury, convinced of guilt, properly reached its conclusion on the [greater] offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the [prosecution] has no recourse if it wishes to correct the jury's error; the [prosecution] is precluded from appealing or otherwise upsetting such an acquittal by the [c]onstitution's [d]ouble [j]eopardy [c]lause.''[11] (Footnote omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 585, quoting *United States* v. *Powell*, supra, 65. In *Powell*, the Supreme Court reasoned that challenging an inconsistent guilty and not guilty verdict should not be permitted in part because "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts.'' *United States* v. *Powell*, supra, 67.

We recently had occasion to consider a challenge to our holding in *State* v. *Arroyo*, supra, 292 Conn. 558. In *State* v. *Henderson*, 348 Conn. 648, 309 A.3d 1208 (2024), we concluded that "the defendant [had not] advanced the most cogent reasons and inescapable logic that would compel us to overrule or modify *Arroyo*.'' (Internal quotation marks omitted.) Id., 657. We explained that we continued to "agree with the state and adhere to our conclusion in *Arroyo* that there is no appellate remedy for an inconsistent verdict. If there is anything for the parties or the trial court to do to address an inconsistency in a jury's verdict, it must be done before the jury has been discharged.'' Id., 656. In arriving at

_____

[11] The United States Supreme Court recently cited approvingly to *Powell*, noting that it has "long recognized that, [although a finding of not guilty] might reflect a jury's determination that the defendant is innocent of the crime charged, such a verdict might also be the result of compromise, compassion, lenity, or misunderstanding of the governing law.'' (Internal quotation marks omitted.) *McElrath* v. *Georgia*, 601 U.S. 87, 94, 144 S. Ct. 651, 217 L. Ed. 2d 419 (2024).

State *v.* Dixon

this conclusion, we recognized that "[a]n undeniable tension exists when appellate courts confront inconsistent verdicts on appeal because they present a situation [in which] error, in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." (Internal quotation marks omitted.) Id., 658. We also recognized the limitations appellate courts face when remedying legal errors. "[W]hen a jury has [returned] legally inconsistent verdicts, there is no way for the reviewing court to know which charge the jury found to be supported by the evidence. . . . In most cases, we have no way of knowing if the jury's verdict was an unintentional error or a conscious choice of lenity. . . . Reviewing inconsistent verdicts on appeal risks unduly speculating about the jury's intent in delivering its decision, despite precedent establishing that the court should not insert itself into jury deliberations." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 658–59. We also explained that, unlike with inconsistent guilty verdicts, "[n]othing in the federal constitution prohibits a court from accepting the inconsistencies between guilty and not guilty verdicts . . . ." Id., 662. Finally, we noted that "this court never has set aside a verdict on the ground that a conviction on one charge was legally or logically inconsistent with an acquittal on another charge." (Internal quotation marks omitted.) Id., 660. We decline to do so today. Because we continue to find our analysis in *Arroyo* persuasive, especially in light of our recent reconsideration of its propriety, we decline the defendant's invitation to modify our holding in *Arroyo*.

IV

SUFFICIENCY OF THE EVIDENCE

Finally, we turn to the defendant's contention that the state failed to present sufficient evidence from which

353 Conn. 382    SEPTEMBER, 2025    417

State *v.* Dixon

the jury could reasonably have found him guilty of manslaughter in the first degree with a firearm.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

State *v.* Dixon

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Brown*, 345 Conn. 354, 369–70, 285 A.3d 367 (2022).

The defendant was convicted of reckless manslaughter in the first degree with a firearm in violation of § 53a-55a (a). Section 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ." General Statutes § 53a-55, in turn, provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

Here, the defendant principally relies on his acquittal of criminal possession of a firearm to demonstrate that the jury necessarily concluded that there was insufficient evidence that he had a gun, which is an essential element of the offense of first degree manslaughter with a firearm. The defendant argues that the jury must have discredited Gill's testimony that the defendant pos-

State *v.* Dixon

sessed a gun, given that it found the defendant not guilty of the possession charge. The defendant points out several reasons why the jury may have discredited Gill, including that Gill was held on a material witness warrant over the weekend before he testified, Gill had several felonies and misdemeanors pending against him at the time of his testimony, the same prosecutors trying the defendant's case were handling Gill's cases, and Gill admitted to changing his story to the police regarding the shooting.

At bottom, the defendant contends that the fact that the jury found him not guilty of criminal possession of a firearm necessitates a conclusion that the jury also determined that there was insufficient evidence to find the defendant guilty of manslaughter, given the common firearm element. This contention, however, is nothing more than a variation of the defendant's claim regarding *State* v. *Arroyo*, supra, 292 Conn. 558. See part III of this opinion. We need not address it further, other than to reiterate that "[i]t has long been recognized that criminal juries in the United States are free to [return] not guilty verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors." (Internal quotation marks omitted.) *State* v. *Colon*, 257 Conn. 587, 603, 778 A.2d 875 (2001). Moreover, as to Gill's credibility, it is well established that, "[w]hen reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury." (Internal quotation marks omitted.) *State* v. *Haughwout*, 339 Conn. 747, 765, 262 A.3d 791 (2021). For this court to undertake an assessment of the jury's reasons for finding the defendant not guilty of criminal possession of a firearm would be nothing more than "pure speculation . . . ." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 585.

State *v.* Dixon

The defendant also contends that his flight from the scene of the shooting did not suggest consciousness of guilt because he is a "young Black male who understandably feared interactions with the police." Even if we were to agree with the defendant that, in certain circumstances, flight might not be probative of guilt because a Black teenager's avoidance of the police may be due to the belief that interacting with them may be dangerous, this is an inference contrary to the defendant's guilt. When reviewing a sufficiency of the evidence claim, "we construe the evidence in the light most favorable to sustaining the verdict." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 345 Conn. 369. "Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 801, 877 A.2d 739 (2005). "[T]he [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767–68, 36 A.3d 670 (2012). We cannot conclude that an inference that the evidence of the defendant's flight constituted consciousness of guilt is "so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Morgan*, supra, 801. The state presented evidence that the defendant, Davis, and Jean-Baptiste fled the scene while looking over their shoulders and concealing their identities. Several surveillance cameras tracked their movements. The evidence also established that the defendant discarded his jacket and that the three teenagers hid in a residential backyard, lying on the wet ground, in the dark, between two trees and surrounded by heavy vegetation. The

State *v.* Dixon

defendant's discarded jacket was later found by Pavia in a nearby alley. The jury reasonably could have inferred that the defendant's flight, in combination with other evidence, established consciousness of guilt that established his identity as the shooter. See, e.g., *State* v. *Patrick M.*, 344 Conn. 565, 577, 280 A.3d 461 (2022) ("[f]light, when unexplained, tends to prove a consciousness of guilt" (internal quotation marks omitted)).

Finally, the defendant contends that the remaining evidence was not sufficient to prove his guilt.[12] Viewed in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient for the jury to have reasonably found the defendant guilty of manslaughter. In addition to the consciousness of guilt evidence, surveillance video placed the defendant, Davis, and Jean-Baptiste at the scene of the shooting. Gill testified that, one month prior to the shooting, the defendant had assaulted and robbed Gill. Gill further testified that he saw the defendant pull a silver gun from the waistband of his pants moments before Robinson was shot. Gill also identified a gun the defendant is seen holding in a video extracted from Davis' cell phone as being the same gun the defendant possessed during the shooting. Metadata established that the video was created approximately two and one-half hours prior to the shooting.[13] Analysis found lead—one of three elements that comprise gunshot residue—on the defendant's hands and jacket. From this testimony and other evidence, the

_____

[12] The defendant also contends that the jury's guilty verdict was based on racial stereotypes presented by Cooper. We disagree. As we previously explained, Cooper never testified before the jury regarding the demographics of the neighborhoods at issue. See part I A of this opinion. Indeed, the defendant has not identified, and our review of the record has not uncovered, any instance in which Cooper discussed the demographics of the neighborhoods, or race in general, in the presence of the jury.

[13] In the video, the defendant can be seen wearing distinctive jeans with holes and bleached areas in the front. Surveillance footage recorded the defendant wearing these jeans minutes before the shooting.

State *v.* Dixon

jury reasonably could have inferred that the defendant had shot Robinson. Cf. *State* v. *Robert R.*, 340 Conn. 69, 90, 262 A.3d 810 (2021) ("a single witness is sufficient to support a finding of guilt beyond a reasonable doubt" (internal quotation marks omitted)). Construing all of the evidence in the light most favorable to sustaining the verdict, we conclude that the jury "reasonably could have concluded that the cumulative force of the evidence established [the defendant's] guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 345 Conn. 369.

The judgment is affirmed.

In this opinion D'AURIA and ECKER, Js., concurred, and MULLINS, C. J., and ALEXANDER and DANNEHY, Js., concurred in part and in the judgment.

DANNEHY, J., with whom MULLINS, C. J., and ALEXANDER, J., join, concurring in part and concurring in the judgment. The defendant, Sirus Dixon, claims, and the majority concludes, that the trial court erred in admitting Sergeant Bryan Cooper's expert testimony on "Stamford neighborhoods, neighborhood divisions, and the dynamics between them" because the evidence was not relevant and was unduly prejudicial. Although I agree with the majority that evidence relating to "neighborhood beefs" is akin to local gang disputes and should be considered as such for admissibility purposes, I write separately because I disagree that the trial court erred in admitting all of Cooper's testimony. The record reflects that there was a sufficient factual basis on which the court could have reasonably concluded that the portion of Cooper's testimony relating to Stamford neighborhoods and neighborhood beefs was a proper subject for expert testimony. See Conn. Code Evid. §§ 4-1 and 7-2. The trial court did, however, abuse its discretion by failing to limit the scope of Cooper's testimony, par-

353 Conn. 382 SEPTEMBER, 2025 423

State *v.* Dixon

ticularly relating to his relationships in the community and information about large-scale drug and firearms trafficking, because such testimony, although arguably relevant to his qualification to testify as an expert, was far more prejudicial than probative.[1] See Conn. Code Evid. § 4-3. For that reason, I respectfully concur in the portion of part I B of the majority opinion addressing the admission of Cooper's testimony. However, because I agree with the majority that any error was harmless, I join in the majority's harmlessness conclusion in that same part, as well as in all other respects.

It is well established that "[e]xpert testimony should be admitted when: (1) the witness has special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 269, 269 A.3d 104 (2022). For an expert opinion to be helpful, the "opinion must have some basis in relevant facts . . . to ensure that the opinion is not entirely speculative or irrelevant to the issues in the case." *Weaver* v. *McKnight*, 313 Conn. 393, 416 n.3, 97 A.3d 920 (2014); see Conn. Code Evid. §§ 4-1 and 7-4 (a); see also *State* v. *Jones*, 351 Conn. 324, 332, 330 A.3d 118 (2025) (noting that "[t]he relevance requirement . . . is a fairly low hurdle" (internal quotation marks omitted)); *State* v. *Borrelli*, 227 Conn. 153, 172 n.15, 629 A.2d 1105 (1993) ("expert testimony, like all other evidence, must be relevant to be admitted").

[1] I do not find persuasive either of the all-or-nothing arguments advanced by the parties regarding Cooper's testimony. Rather, as this court has done in cases too numerous to mention, I have considered the record and arguments in the briefs in deciding the very claim raised by the defendant—whether the trial court abused its discretion in admitting Cooper's testimony because it "was not relevant, was unduly prejudicial, and constituted improper propensity evidence"—and resolved the claim on narrower grounds. Part I B of the majority opinion; see, e.g., *Meribear Productions, Inc.* v. *Frank*, 340 Conn. 711, 732–33, 265 A.3d 870 (2021).

State *v.* Dixon

The testimony of several witnesses at trial, including Tyrik Gill, former Stamford Police Sergeant Christian DiCarlo, and the sister of the victim, Antonio Robinson, established a sufficient factual foundation to render Cooper's expert testimony, with respect to neighborhood associations and ongoing disputes or beefs, helpful to the jury in considering a material issue in the case, namely, motive. Specifically, the prosecutor elicited testimony from those witnesses relating to the different neighborhoods in Stamford and a "beef" between two of the neighborhoods, one of which the defendant purportedly "repped."

On direct examination, Gill explained that he grew up in "the Village,"[2] but that, by 2018, he had moved closer to the victim's home located on Connecticut Avenue. About one month before the shooting, Gill had an altercation with the defendant. Gill testified that, on that day, he was followed home by three individuals, one of whom was the defendant. Once Gill arrived at his house, one of the individuals grabbed Gill's jacket, punched him in the face, and pulled him to the ground. The defendant then kicked and punched Gill, and they stole his sneakers. Gill did not immediately inform the police of this altercation when he met with them after the shooting. A few months after the shooting, however, Gill shared this information with the police and provided a written statement. When asked why he initially did not tell the police everything he knew, Gill explained he did not do so because he was "scared" and "afraid" of "[r]etaliation."

Included within Gill's written statement were other notable details about this altercation. In his statement, Gill explained that, as he was being followed, one of

_____

[2] "The Village" was once known as "Southfield Village," and is now referred to as "Southwood Square." Throughout the testimony and dialogue with the court, this location was also referred to as the "West Side Village."

State *v.* Dixon

the individuals asked if Gill had "beef with them," to which Gill responded, "I don't care about ya beef." After recounting this exchange, Gill explained in his statement that, "[i]n the past there has been beef between the [W]est [S]ide and Conn[ecticut] Avenue. I lived in the [V]illage, but I have a lot of friends on the [W]est [S]ide, and they probably thought I had beef with them." The statement was not admitted for substantive purposes at trial,[3] but DiCarlo recounted similar information in his testimony, which was admitted for substantive purposes.

On direct examination, DiCarlo testified that he was able to determine a motive through his investigation of the murder. He explained that "Gill stated that there was an ongoing beef between the Connecticut Avenue and the West Side. [Gill] was originally living on the West Side in the Village and had recently moved over to Conn[ecticut] Avenue. . . . [T]here was a beef between him and [the defendant] where [Gill] was beat up and robbed of his sneakers."

The victim's sister also testified at trial. During her testimony, she explained that, on the night of the shooting, shortly after the victim had left their mother's home on Connecticut Avenue, she left the home as well. On the way back to her own home, the victim's sister drove through a ShopRite parking lot where she stopped and allowed the defendant and two other boys, who were running through the parking lot, to pass by. She explained that she could identify the defendant because he was

_____

[3] With respect to Gill's statement, the court instructed the jury: "Also in evidence is state's exhibit 5, which is the signed written statement of . . . Gill given in an interview with . . . DiCarlo of the Stamford Police Department on September 8, 2018. That statement was offered by the state as a prior consistent statement of . . . Gill for the limited purpose of repairing his credibility and to rebut the suggestion of a recent contrivance. Note that such prior out-of-court statements of . . . Gill, whether they are consistent or inconsistent, may not be considered as substantive evidence. They may be considered by you only as they relate to his credibility."

State *v.* Dixon

related to two of her other siblings. She did not know
where the defendant was living at the time of the shoot-
ing but testified that he was associated with "Connecti-
cut Avenue where, you know, where he's from, I guess."
And when asked if she referred to the three boys as
the "Conn. Ave. boys" when speaking to the police, she
responded, "[p]robably, yes." She later explained that
"Conn. Ave. boys" did not include everyone "that live[d]
over there" but "[a]ny boy who reps it . . . ." She then
explained that she knew "the ones who repped them
. . . ."

DiCarlo's testimony, together with the testimony of
the victim's sister, established a nexus between the
neighborhood associations and the defendant's poten-
tial motive for the shooting. Specifically, there was evi-
dence that the defendant "repped" and was affiliated
with the Connecticut Avenue neighborhood, which had
an ongoing beef with, and animus toward, the West
Side neighborhood, with which Gill was purportedly
associated. In my view, this evidence established a suffi-
cient factual basis for Cooper's expert testimony regard-
ing Stamford neighborhood associations and the beefs
between them.[4]

At trial, Cooper testified about his tenure with the
Stamford Police Department and his specialized train-
ing with the Narcotics Enforcement Officer Associa-
tion, which included some gang training, and with the
Police Officer Standards and Training Council (POSTC).
He also noted that he was the certified gang instructor

---

[4] In addition to there being a sufficient factual basis for some of Cooper's
testimony, Stamford neighborhood associations were a proper subject for
expert testimony because Cooper's knowledge was directly applicable to a
matter in issue, namely, motive, and such knowledge about the neighbor-
hoods is not common to the average person. See Conn. Code Evid. § 7-2.
Further, it should be noted that the defendant does not contest Cooper's
qualification as an expert on appeal.

State *v.* Dixon

for the Stamford Police Department.[5] When asked whether he had any training specific to Stamford neighborhoods, he responded that "a lot of [his] training is based on [his] intimate knowledge in narcotics [and his] relationships with confidential informants, cooperating witnesses, and certain citizens," that, at POSTC, he had to "build a curriculum based on . . . national gangs," and that he teaches officers about "Stamford neighborhood[s]" and their "current and past beef[s] and alignments." When asked a broad question about what information he gathered from members of the community with whom he had fostered relationships, Cooper responded, "[l]arge-scale drug trafficking within the city. Large-scale firearm[s] trafficking." He went on to describe coordination with the patrol unit that led to "convictions [for] homicides, shootings, serious assaults and robberies."

Immediately following this questioning, the prosecutor asked a narrow question that focused on whether Cooper had gathered information related to specific neighborhoods in Stamford. Cooper testified that he had learned "what neighborhoods align with other neighborhoods, what neighborhoods get along with other neighborhoods, and what neighborhoods don't get along with each other." Cooper then explained the different neighborhood associations, including the West Side and Connecticut Avenue, and that to "rep" a neighborhood meant

_____

[5] Before Cooper testified at trial, he testified outside the presence of the jury in order for the trial court to determine the admissibility of his expert testimony. At the conclusion of the preliminary testimony and after considering defense counsel's objection that Cooper's testimony was more prejudicial than probative, the court ruled that "evidence of gang affiliation is admissible and relevant and probative on the issue of motive." When the prosecutor inquired about using the term "gang" in connection with Cooper's training, the trial court explained that it was trying to avoid the use of the term "gang" to minimize the prejudicial effect and said that Cooper could talk "about neighborhood beefs; that's all within the scope of what the court's allowing."

State *v.* Dixon

that the person was "aligned with that neighborhood, whether it's crime activity or noncriminal activity." The prosecutor then offered Cooper as an expert, and he opined, based on his training and experience, about ongoing disputes between particular neighborhoods in Stamford in April, 2018. Cooper testified that there were a few ongoing disputes between particular neighborhood divisions, including an ongoing beef between the Connecticut Avenue division, which refers to itself as "GB Money Dollar Sign A," and the West Side division, which refers to itself as the "D-1 Boys . . . ." Cooper testified that there would be a "[b]ig problem" if someone who "associates with the West Side either directly or through a friend went to Connecticut Avenue" because, "with the ongoing beef . . . you wouldn't see someone from the Spruce Street area," which he had explained was on the West Side, "hanging out in Connecticut Avenue and vice versa."

In the present case, although I conclude that some of the neighborhood evidence was properly admitted into evidence to help the jury understand a motive for the killing, I also conclude that certain evidence was not. The trial court properly admitted Cooper's testimony relating to the geographic divisions of the neighborhoods in Stamford, their past relationships, and the consequences that may occur if an individual, who either directly or indirectly aligned with one neighborhood, visited a different neighborhood, because such evidence was highly probative of the issue of motive.[6]

---

[6] In concluding that all of Cooper's testimony was more prejudicial than probative, the majority emphasizes the prosecutor's concession that the state had "no evidence to show [that the defendant had] any gang involvement." Although the prosecutor made this concession, she did so in an attempt to distinguish "gang" evidence from "neighborhood" evidence, which the majority and I now conclude is a distinction without a difference. This, however, does not change the fact that evidence of gang affiliation, or a neighborhood "beef," is probative of the issue of motive. Indeed, after making this representation to the trial court, the court asked the prosecutor how the neighborhood evidence was relevant, to which she aptly responded, "[i]t goes [toward] motive, Your Honor. Having someone come in and serve as

State *v.* Dixon

See, e.g., *State* v. *Bermudez*, 341 Conn. 233, 252, 267 A.3d 44 (2021) ("gang affiliation evidence may be relevant to . . . explain an otherwise inexplicable act" (internal quotation marks omitted)), quoting *State* v. *Dean*, 310 Kan. 848, 862, 450 P.3d 819 (2019); *Atchison* v. *United States*, 257 A.3d 524, 532 (D.C. 2021) (concluding that generalized neighborhood feud evidence was relevant and probative because it supplied motive for otherwise unexplained assault).

Given that Gill had recently moved from another area in Stamford, and given the defendant's connection to the "Conn. Ave. boys" and the altercation between Gill and the defendant one month prior to the shooting, expert testimony related to neighborhood relationships was relevant and helpful to the jury in understanding whether the defendant may have been motivated to shoot toward Gill, mistakenly killing the victim, due to Gill's potential connections to the West Side. Indeed, Cooper's testimony that there would be a "[b]ig problem" if someone who "associates with the West Side either directly or through a friend went to Connecticut Avenue," certainly speaks to whether the defendant, someone who is aligned with Connecticut Avenue, would have a motive to shoot someone associated with the West Side. See, e.g., *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013) (explaining that gang affiliation evidence may be highly probative of motive). In addition, the trial court properly instructed the jury that this evidence could be considered only for the limited purpose of motive.[7]

_____

an expert to identify the different neighborhoods in Stamford, to identify the dynamics between them would lend [toward] motive. In this case, we anticipate testimony to indicate that [the defendant] was a part of one neighborhood and that [Gill] was a part of another, and that is sort of the crux of the beef between the two."

[7] The trial court instructed the jury: "You heard testimony from . . . Gill of a prior physical altercation between [him] and the defendant in April of 2018, approximately one month before this alleged shooting. You also heard testimony that, during the same time frame, neighborhood divisions existed between different geographic areas within the city of Stamford and the

State *v.* Dixon

Other portions of Cooper's testimony, however, although arguably relevant to his qualification to testify as an expert, were far more prejudicial than probative and should have been excluded by the trial court. We have consistently recognized that, when gang affiliation evidence, or its equivalent, is offered, the trial court must carefully evaluate the evidence, which includes information related to how a police officer may have acquired expertise in a certain area, to determine whether it is more prejudicial than probative because such evidence may, in certain circumstances, unduly arouse the emotions of the jurors. See, e.g., *State* v. *Jones*, supra, 351 Conn. 333 (explaining that courts must carefully evaluate probative value of gang affiliation evidence "to ensure that it is sufficiently significant to overcome the potential for unfair prejudice"); *State* v. *Bermudez*, supra, 341 Conn. 250 (explaining that courts must exercise caution because gang affiliation evidence often invokes images of criminal activity and deviant behavior, thereby creating risk that jurors will engage in propensity reasoning); *State* v. *Tomlinson*, 340 Conn. 533, 572, 264 A.3d 950 (2021) ("[a]s with any evidence that might suggest a propensity for violence or might play on potential juror biases, defendants should request and trial courts should grant measures to minimize any undue prejudice").

Although the present case involves disputes between neighborhood associations, I do not see a meaningful

residents living there, such as . . . Gill and [the defendant]. I instruct you that you may use that evidence, to the extent that you find it should be given weight, only as to the existence of a possible motive for the shooting. Any other use of that testimony would be improper. In other words, this evidence cannot be considered as establishing the identification of the defendant as the shooter, or a bad character or predisposition on his part to commit the crime charged, or to demonstrate a criminal propensity. It may be considered only to the extent that you find it may bear on the issue of a possible motive to commit the crime charged. However, you are not obligated to do so."

State *v.* Dixon

distinction between this evidence and gang affiliation evidence. Accordingly, the trial court must exercise the same level of caution when considering the admissibility of such evidence. Here, Cooper's testimony in response to very broad questions about his training and relationships with the community introduced evidence of narcotics, large-scale drug trafficking, and large-scale firearms trafficking. This evidence, which immediately preceded the more probative "neighborhood" testimony, was unduly prejudicial because it needlessly evoked images of a certain type of criminal gang activity that was not present in this case. When the state is offering gang evidence, a court may need to require the prosecutor to ask more focused, narrowly tailored questions because of the risk of unfair prejudice posed by such evidence. Although the trial court, in the present case, specifically limited Cooper's testimony to neighborhood beefs, it did not then carefully balance and exclude the highly prejudicial, yet at best minimally probative, testimony relating to Cooper's knowledge of narcotics and large-scale drug and firearms trafficking in Stamford. Accordingly, in this respect, I conclude that the trial court abused its discretion by failing to limit the scope of Cooper's testimony.[8]

Although I conclude that the admission of Cooper's testimony relating to his knowledge of narcotics and large-scale drug and firearms trafficking in Stamford was more prejudicial than probative, I nevertheless conclude that the error was harmless. See *State* v. *Toro*,

_____

[8] The defendant also contends that the admission of the testimony constituted improper propensity evidence. I disagree. Although the trial court abused its discretion in failing to limit the scope of the evidence related to neighborhood associations, it properly admitted certain neighborhood association evidence as relevant to motive and not for purposes of "demonstrat[ing] [the] defendant's criminal propensity or bad character." *State* v. *Jones*, supra, 351 Conn. 333. In addition, the trial court instructed the jury that the challenged evidence should not be used to show propensity. See footnote 7 of this opinion.

State *v.* Dixon

172 Conn. App. 810, 818–20, 162 A.3d 63 (explaining that, although prejudice and harm may overlap, they are distinct issues and harm inquiry is broader in scope), cert. denied, 327 Conn. 905, 170 A.3d 2 (2017). I therefore join in the harmlessness conclusion in part I B of the majority opinion. Cooper's testimony was relatively brief. In total, the discussion of narcotics and large-scale drug and firearms trafficking comprised less than a single transcript page, and, importantly, the prosecutor did not refer to this testimony during her summation. Furthermore, Cooper's improper testimony was admitted for a limited purpose in two respects. First, the testimony came in only while Cooper was explaining his credentials for the purpose of being qualified as an expert. Cooper did not discuss narcotics and large-scale drug and firearms trafficking with respect to specific neighborhoods in Stamford, including the neighborhood that the defendant purportedly "repped." Second, the court instructed the jury on the limited use of Cooper's expert testimony.[9] Finally, I agree with the majority that the state's case was strong, and even stronger when considering the evidence of motive that I, unlike the majority, conclude was properly admitted.

Accordingly, I respectfully concur in the portion of part I B of the majority opinion addressing the admission of Cooper's testimony but join in the majority's harmlessness determination in that same part, as well as in all other respects.

_____

[9] Specifically, the court explained, in part, that the expert testimony presented is not "binding upon [the jurors], and . . . [the jurors] may disregard this testimony either in whole or in part. It is for [the jurors] to consider this testimony with the other circumstances in the case and, using [their] best judgment, [to] determine whether [they] will give any weight to it and, if so, what weight [they] will give to it."